UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CENTRAL UTA OF MONSEY, CONGREGATION YETEV LEV OF MONSEY, CHESKEL AND HENNY WERZBERGER, individually and on behalf of their minor children, M.W., G.W., and C.W., MORDECHI AND RACHEL EGER, individually and on behalf of their minor children, B.E. and G.E., ALEXANDER AND SARA SICHERMAN, individually and on behalf of their minor child, R.S., CHAIM AND CHAYA WERCBERGER, individually and on behalf of their minor child, R.W., RUBEN AND BAILA WERCZBERGER, individually and on behalf of their minor child, B.W., JOEL AND RIVKY GROSS, individually and on behalf of their minor children, M.G. and W.G., JOEL AND ESTY WERZBERGER, individually and on behalf of their minor child, T.W., HERSHEL and MALKA LANDAU, individually and on behalf of their minor child R.L.,YITZCHOK LEBOVITS, YOSEF GRUBER, GITTY KASIRER, YITZHOK SCHIFF, ARON GLAUBER, and RIFKI GLAUBER,

Plaintiffs,

-against-

VILLAGE OF AIRMONT, NEW YORK; PHILIP GIGANTE, Individually and as Mayor of the Village of Airmont; SEAN MACK, Individually and as Village Attorney; LISA-ANN DIMARSICO-SMITH, Individually and as Village Clerk and Treasurer of the Village of Airmont; VILLAGE OF AIRMONT BOARD OF TRUSTEES; PAUL MARCHESANI, ANTHONY VALVO, PETER BLUNNIE, KEVIN WARBRICK, individually and as members of the Village of Airmont Board of Trustees; VILLAGE OF AIRMONT ZONING BOARD OF APPEALS; MARTIN KIVELL, ARTHUR KATZ, CHARLES PICARELLI, LAURIE DIFRANCESCO, SCOTT MEIER, MATT RYAN, and LINDA CARBONE, individually and as members of the Village of Airmont Zoning Board of Appeals; VILLAGE OF AIRMONT PLANNING BOARD; JOHN CORNELIUS, DOUGLAS WHIPPLE, ANTHONY SANTUCCI, WILLIAM PHILIP, RUSSELL HOCK, PAVLE LECEI, KEN BREZNER, individually and as members of the Village of Airmont Planning Board; BUILDING DEPARTMENT OF THE VILLAGE OF AIRMONT; LOUIS ZUMMO, individually and as Building Inspector for the Village of Airmont; MARINO FONTANA, individually and as Code Enforcer of the Village of Airmont; SUFFERN CENTRAL

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Civil Action No.: 18-11103

SCHOOL DISTRICT; and DOUGLAS S. ADAMS, Individually and
as Superintendent of Suffern Central School District;

Defendants.

---

Plaintiffs Central UTA of Monsey ("Central UTA"), Congregation Yetev Lev of Monsey, Cheskel and Henny Werzberger, individually and on behalf of their minor children, M.W, G.W., and C.W., Mordechi and Rachel Eger, individually and on behalf of their minor children, B.E. and G.E., Alexander and Sara Sicherman, individually and on behalf of their minor child, R.S., Chaim and Chaya Wercberger, individually and on behalf of their minor child, R.W., Ruben and Baila Werczberger, individually and on behalf of their minor child, B.W., Joel and Rivky Gross, individually and on behalf of their minor children, M.G. and W.G., Joel and Esty Werzberger, individually and on behalf of their minor child, T.W., Hershel and Malka Landau, individually and on behalf of their minor child R.L.,Yitzchok Lebovits, Yosef Gruber, Gitty Kasirer, Yitzhok Schiff, Aron Glauber, and Rifki Glauber (collectively "Plaintiffs"), by and through their attorneys, Whiteman Osterman & Hanna LLP and First Liberty Institute, as and for its Complaint in this matter against the Village of Airmont, New York, Philip Gigante, the Village of Airmont Board of Trustees, Paul Marchesani, Anthony Valvo, Peter Blunnie, Kevin Warbrick, the Village of Airmont  Zoning Board of Appeals, Martin Kivell, Arthur Katz, Charles Picarelli, Laurie DiFrancesco, Scott Meier, Matt Ryan, Linda Carbone, the Village of Airmont Planning Board, John Cornelius, Douglas Whipple, Anthony Santucci, William Philip, Russell Hock, Pavle Lecei, Ken Brezner, the Building Department of the Village of Airmont, Louis Zummo, and Marino Fontana (collectively, "Village Defendants"), Suffern Central School District, and Douglas Adams (collectively, "Suffern Defendants") respectfully allege as follows:

**INTRODUCTION**

1.     Plaintiffs have commenced this action to stop pervasive, government-sponsored religious discrimination.  The governing bodies of the Village of Airmont (the "Village" or "Airmont") and Suffern Central School District ("Suffern Central"), in a coordinated and concerted effort, are engaged in yet another conspiracy to prevent Hasidic Jews from operating a private religious school to serve the educational needs of the surrounding Hasidic Jewish community.

2.     This discriminatory campaign is nothing new for the Village.  Indeed, Airmont, which is located within the Town of Ramapo and Rockland County, New York, has a longstanding history of discrimination against the Hasidic Jewish population.

3.     Airmont incorporated in 1991. Almost immediately, the United States Department of Justice ("DOJ") brought suit against Airmont alleging that the impetus for the Village's formation "was an animosity toward Orthodox Jews as a group." *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 431 (2d Cir. 1995). As a result of that litigation, Airmont was ordered to re-write its zoning laws to remove discriminatory provisions intended to exclude the Hasidic Jewish population and pay over $1 million dollars in legal fees.

4.     Undeterred, Airmont continued to deploy overtly anti-Semitic tactics and, in 2005, DOJ sued Airmont, the Village of Airmont Board of Trustees (the "Board of Trustees"), and the Village of Airmont Planning Board (the "Planning Board") again, this time for violations of the Fair Housing Act and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). After six years of litigation, Airmont settled and agreed to enact further zoning changes to permit the development of a religious school and dorm. *U.S. v. The Village of*

*Airmont*, No. 05-cv-05520-LAK-PED, Dkt. 53, (S.D.N.Y. May 6, 2011). To date, however, the religious school still is not completed, and Airmont's discriminatory acts hit their mark.

5.      Apparently not yet having learned its lesson that systemic anti-Hasidic animus and discriminatory conduct will not be tolerated under the law, Airmont has once again engaged in a series of patently illegal actions to block the lawful, long-standing use of Central UTA's 21-acre property as a religious school and to frustrate its plans to expand the school to support the growing Hasidic population in the area.

6.      The anti-Hasidic animus is unmistakable. Village officials have attempted to place a cap on the total number of Hasidic Jewish children that may be educated at Central UTA's Hasidic Jewish religious school, angry protesters have prevented a meeting of the Planning Board to consider Central UTA's application to build two new school buildings from occurring, and Village officials' political campaign advertisements paint an apocalyptic picture of what will happen if their opponents who support the rights of the Hasidic Jewish community are elected. That is just the tip of the iceberg.

7.      Defendants are using their political, policymaking and enforcement authority to use the Village's zoning laws and ordinances to prevent and dissuade Hasidic Jews from joining their community and denying those families that have moved to the area their rights to school services that are guaranteed under the law.

8.      The Village and Suffern Central have taken increasingly lawless actions over the course of the last year. To take one example, since 2001, Airmont has granted approvals for and allowed a private non-Hasidic, Jewish religious school to operate with an enrollment of approximately 400 students without complaint. Yet, once Central UTA purchased the property in August 2016, began operating a religious school for the children of the Hasidic Jewish

community, and advised the Village of its intention to build two new school buildings on the property to accommodate its growing enrollment, the Village's treatment of the school changed.

9.       Central UTA has already commenced an Article 78 proceeding and declaratory judgment action in New York Supreme Court, Rockland County to annul the latest step in the Village's campaign, a determination of the Village ZBA on May 16, 2018. The decision affirmed a Notice of Violation dated August 5, 2017, that attempts to enforce an unlawful 167-student enrollment restriction on Central UTA's Hasidic Jewish religious school.

10.      The Village ZBA's determination, in effect, limits the use of Central UTA's entire 21-acre property as a Hasidic Jewish religious school to 167 students based on certificates of occupancy that relate only to certain buildings on the site. Certificates of occupancy, however, do not and cannot restrict the maximum number of students that a school may enroll throughout all its buildings. The Village ZBA has a long-standing custom of weaponizing its zoning laws to stifle the Hasidic education of Village residents.

11.      Furthermore, Plaintiffs, including Central UTA, sought, for three school years, to obtain routine transportation and special needs services from Suffern Central to its private religious school for the instruction of Hasidic Jewish children. Indeed, Suffern Central provided these very same services to the private religious school that operated before Central UTA purchased the property. The only difference between the two institutions is that Central UTA serves the Hasidic Jewish community.

12.      Central UTA's religious school is urgently needed by Hasidic residents, whose religious practices otherwise oblige them to home school their children or to send them to parochial schools well outside the area.  Hasidic Judaism requires that a child's education

include regular study of the Torah, making schools like Central UTA's integral to the religious exercise of Hasidic Jewish believers.

13.     The religious school is a permissible use under the zoning code, and Central UTA sought only to enroll the same number of students as the previous school, and the public elementary school across the street, to obtain the same required services from Suffern Central, and acquire a site approval plan to expand the school facilities over the next few years.

14.     Because opponents fear that expanding Central UTA's religious school would encourage additional Hasidic families to move into the area, the Village has launched a coordinated, multi-faceted campaign of discrimination against Central UTA designed to unconstitutionally exclude the Hasidic Jewish community as well as thwart the growth and religious exercise of Central UTA's school.

15.     For example, when Central UTA submitted an informal application to the Planning Board to build new school buildings on its 21-acre site, the Mayor of Airmont, Philip Gigante ("Defendant Gigante"), and the local newspaper, *The Rockland Star*, drummed up opposition to Central UTA by making false claims about Central UTA's application.

16.     Hundreds of angry residents overwhelmed the first Village Planning Board meeting on the application forcing the meeting to be postponed multiple times, once due to excess capacity and then again when a suitable venue could not be found to accommodate the large crowds that were expected.

17.     At all times, Defendant Gigante acted pursuant to the Village of Airmont and the Airmont Board of Trustees' established custom and practice of delaying, harassing, and preventing the Hasidic Jewish community's religious exercise.

18.     As a result, more than two years after initially purchasing the school property and opening the school, Central UTA remains unable to obtain the most basic approvals to operate and expand its school.

19.     Moreover, the individual plaintiffs, and many other Hasidic Jewish parents in the community, have been deprived of their ability to have their children attend the school for the 2017-2018 and 2018-2019 school years and have had to find substitute education for their children. Even those children who have been fortunate enough to enroll have been denied basic transportation and special education services as a result of Defendants' systemic discrimination.

20.     These discriminatory actions speak louder than words. Yet in private settings, the Village leaders have left no ambiguity about their intentions.

21.     Defendants know that if Plaintiffs are forced to contest each and every unlawful zoning denial or discriminatory building regulation enforcement in the state courts, operation of the religious school and redevelopment of the property will continue to be delayed, and the costs to Plaintiffs will continue to increase exponentially.

22.     Because Airmont and its local government officials have renewed their pervasive campaign of religious discrimination, Plaintiffs commence this action pursuant to the United States Constitution, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 3604, 42 U.S.C. § 1983, and 42 U.S.C. § 1985, among other provisions of law. Plaintiffs respectfully ask this Court to compel Defendants to end this unlawful campaign, to clear the road blocks imposed upon lawful development and operation of Central UTA's Hadistic Jewish school, and to award Plaintiffs damages and attorneys' fees, as appropriate under the law.

## PARTIES

23.     Plaintiff Central UTA is the record owner of real property located at 212/236 Cherry Lane, on which it operates a private religious school for the education of children of the Hasidic Jewish community. Central UTA is located in the Suffern Central School District.

24.     Plaintiff Congregation Yetev Lev of Monsey, Inc. is a not-for-profit religious organization located in Monsey in the Town of Ramapo, New York. The Congregation is a shul closely associated with the Central UTA school and purchased its $23 million property in reliance on Central UTA being able to provide educational services to the families that intended to move to Airmont and join the Congregation, including some of the individual Plaintiffs.

25.     As a result of the discriminatory acts described in this Complaint, including the unconstitutional and irrational limitation on the number of students that may attend Central UTA's school, families, including some of the individual Plaintiffs, are prevented from moving to Airmont and exercising their First Amendment free exercise and associational rights by joining the Congregation and freely practicing their faith.

26.     Additionally, the Defendants' discriminatory acts have precluded members of the Congregation from obtaining jobs with Central UTA, and have directly harmed the Congregation by excluding families, including some of the individual Plaintiffs, from membership and harming the Congregation's ability to pay its mortgage for the property.

27.     Plaintiffs Cheskel and Henny Werzberger, together with their minor children, M.W, G.W., and C.W., are residents of Airmont, New York.

28.     Plaintiff M.W. is unable to attend Central UTA's boys school, which is located approximately 2 to 3 miles from his home, because the Village Defendants have prevented

Central UTA from building adequate facilities to provide a religious education to all students who desire to attend. Instead, Mr. and Mrs. Werzberger are forced to send M.W. to a different religious school for boys approximately 30 minutes away from their home.

29.     Plaintiffs G.W. and C.W. have been unlawfully denied the transportation services to Central UTA's girls school to which they are entitled under the New York Education Law. Mr. and Mrs. Werzberger submitted a request for transportation services to Defendant Suffern Central School District, but that request was denied as a part of Defendants' unconstitutional conspiracy to violate Plaintiffs' civil rights. As a result of Defendants' discriminatory acts, Mr. and Mrs. Werzberger are forced to pay for transportation for G.W. and C.W. that they would otherwise be entitled to receive from Suffern Central without cost.

30.     Plaintiffs Mordechi and Rachel Eger, together with their minor children, B.E and G.E., are residents of Airmont, New York.

31.     Plaintiffs B.E. and G.E. have been unlawfully denied the transportation services to Central UTA's girls school to which they are entitled under the New York Education Law. Mr. and Mrs. Eger submitted a request for transportation services to Defendant Suffern Central School District, but that request was denied as a part of Defendants' unconstitutional conspiracy to violate Plaintiffs' civil rights. As a result of Defendants' discriminatory acts, Mr. and Mrs. Eger are forced to pay for provide transportation for B.E. and G.E. that they would otherwise be entitled to receive from Suffern Central without cost.

32.     Plaintiffs Alexander and Sara Sicherman, together with their minor child, R.S., are residents of Airmont, New York.

33.     Plaintiff R.S. has been unlawfully denied the transportation services to Central UTA's girls school to which she is entitled under the New York Education Law. Mr. and Mrs.

Sicherman submitted a request for transportation services to Defendant Suffern Central School District, but that request was denied as a part of Defendants' unconstitutional conspiracy to violate Plaintiffs' civil rights. As a result of Defendants' discriminatory acts, Mr. and Mrs. Sicherman are forced to pay for transportation for R.S. that they would otherwise be entitled to receive from Suffern Central without cost.

34.     Plaintiffs Chaim and Chaya Wercberger, together with their minor child, R.W., are residents of Airmont, New York.

35.     Plaintiff R.W. has been unlawfully denied the transportation services to Central UTA's girls school to which she is entitled under the New York Education Law. Mr. and Mrs. Wercberger submitted a request for transportation services to Defendant Suffern Central School District, but that request was denied as a part of Defendants' unconstitutional conspiracy to violate Plaintiffs' civil rights. As a result of Defendants' discriminatory acts, Mr. and Mrs. Wercberger are forced to pay for transportation for R.W. that they would otherwise be entitled to receive from Suffern Central without cost.

36.     Plaintiffs Ruben and Baila Werczberger, together with their minor child, B.W., are residents of Airmont, New York.

37.     Plaintiff B.W. has been unlawfully denied the transportation services to Central UTA's girls school to which she is entitled under the New York Education Law. Mr. and Mrs. Werczberger submitted a request for transportation services to Defendant Suffern Central School District, but that request was denied as a part of Defendants' unconstitutional conspiracy to violate Plaintiffs' civil rights. As a result of Defendants' discriminatory acts, Mr. and Mrs. Werczberger are forced to pay for transportation for B.W. that they would otherwise be entitled to receive from Suffern Central without cost.

38.     Plaintiffs Joel and Rivky Gross, together with their minor children, M.G. and W.G., are residents of Airmont, New York.

39.     Plaintiffs M.G. and W.G. have been unlawfully denied the transportation services to Central UTA's girls school to which they are entitled under the New York Education Law. Mr. and Mrs. Gross submitted a request for transportation services to Defendant Suffern Central School District, but that request was denied as a part of Defendants' unconstitutional conspiracy to violate Plaintiffs' civil rights. As a result of Defendants' discriminatory acts, Mr. and Mrs. Gross are forced to pay for transportation for M.G. and W.G. that they would otherwise be entitled to receive from Suffern Central without cost.

40.     Plaintiffs Joel and Esty Werzberger, together with their minor child, T.W., are residents of Airmont, New York.

41.     Plaintiff T.W. has been unlawfully denied the transportation services to Central UTA's girls school to which she is entitled under the New York Education Law. Mr. and Mrs. Werzberger submitted a request for transportation services to Defendant Suffern Central School District, but that request was denied as a part of Defendants' unconstitutional conspiracy to violate Plaintiffs' civil rights. As a result of Defendants' discriminatory acts, Mr. and Mrs. Werzberger are forced to pay for transportation for T.W. that they would otherwise be entitled to receive from Suffern Central without cost.

42.     Plaintiffs Hershel and Malka Landau, together with their minor child, R.L., are residents of Ramapo, New York.

43.     Plaintiff R.L. is hearing impaired and requires use of an FM system in order to obtain a sound basic education. Mrs. Landau submitted a request for special needs services to Defendant Suffern Central School District on behalf of R.L., but that request was denied as a part

of Defendants' unconstitutional conspiracy to violate Plaintiffs' civil rights. As a result of Defendants' discriminatory acts, R.L. has been unlawfully denied special needs services for her hearing impairment to which she is entitled under the New York Education Law, and Mr. and Mrs. Landau are forced to pay for those services out of pocket that they would otherwise be entitled to receive from Suffern Central without cost.

44.     Plaintiff Yitzchok Lebovits is a resident of Brooklyn, New York who desires to move to Monsey to retire near his parents, but can only do so if his four school-aged girls were able to attend Central UTA's girls school. As a result of Defendants' discriminatory acts, including the unconstitutional and irrational limitation on the number of students that may attend Central UTA's school, Central UTA is prohibited from admitting Mr. Lebovits' children. Mr. Lebovits is, therefore, prohibited from moving to Monsey without a suitable Hasidic religious school for his children to attend and forced to maintain a significantly higher cost of living in Brooklyn.

45.     Plaintiffs Yosef Gruber and Gitty Kasirer are residents of Brooklyn, New York who desire to move to Monsey to live in a home that they already own close to their extended family. Mr. Gruber and Ms. Kasirer can only do so, however, if their two school-aged girls and two school-aged boys are able to attend Central UTA's girls and boys schools. As a result of Defendants' discriminatory acts, including the unconstitutional and irrational limitation on the number of students that may attend Central UTA's school and preventing Central UTA from building adequate facilities to provide a Hasidic religious education to all students who desire to attend, Central UTA is prohibited from admitting Mr. Gruber's and Ms. Kasirer's children. They are, therefore, prohibited from moving to Monsey without a suitable Hasidic religious school for their children to attend and forced to maintain a significantly higher cost of living in Brooklyn.

46.     Plaintiff Yitzhok Schiff is a resident of Brooklyn, New York who desires to move to Monsey to live in a home that he owns near his daughter and three grandchildren and other extended family, but can only do so if his school-aged son is able to attend Central UTA's boys school. As a result of Defendants' discriminatory acts, including preventing Central UTA from building adequate facilities to provide a Hasidic religious education to all students who desire to attend, Central UTA is prohibited from admitting Mr. Schiff's son. Mr. Schiff is, therefore, prohibited from moving to Monsey without a suitable Hasidic religious school for his son to attend and forced to maintain a significantly higher cost of living in Brooklyn.

47.     Plaintiffs Aron and Rifki Glauber are residents of Brooklyn, New York who desire to move to Monsey, where Mr. Glauber has worked for the past 25 years, where their extended family resides, and where they already have arranged a living situation. Mr. and Mrs. Glauber can only do so, however, if their two school-aged boys are able to attend Central UTA's boys school. As a result of Defendants' discriminatory acts, including preventing Central UTA from building adequate facilities to provide a Hasidic religious education to all students who desire to attend, Central UTA is prohibited from admitting Mr. and Mrs. Glauber's children. They are, therefore, prohibited from moving to Monsey without a suitable Hasidic religious school for their children to attend and forced to maintain a significantly higher cost of living in Brooklyn while Mr. Glauber has to continue to commute more than an hour and a half to his job, each way.

48.     Defendant Village of Airmont is a political subdivision of the State of New York, with principal offices located in Airmont, Rockland County, New York.

49.     Defendant Village Board of Trustees of the Village of Airmont, New York is the legislative body of the Village of Airmont, and adopted Village Local Law No. 1 of 2016, which is subject to challenge in this action.

50.     Defendant Paul Gigante is the Mayor of the Village of Airmont, New York, a member of its Board of Trustees, and has an office located at 251 Cherry Lane, Tallman, New York 10982.

51.     Defendant Paul Marchesani is the Deputy Mayor of the Village of Airmont, New York, and a member of its Board of Trustees.

52.     Defendant Anthony Valvo is a member of the Board of Trustees of the Village of Airmont, New York.

53.     Defendant Peter Blunnie is a member of the Board of Trustees of the Village of Airmont, New York.

54.     Defendant Kevin Warbrick is a member of the Board of Trustees of the Village of Airmont, New York.

55.     Defendant Lisa-Ann DiMarsico-Smith is the Village Clerk and Treasurer of the Village of Airmont, New York.

56.     Defendant Sean Mack is the Village Attorney of the Village of Airmont, New York.

57.     Defendant Village of Airmont Zoning Board of Appeals is a village zoning board of appeal duly organized under the laws of the State of New York.  The Village ZBA issued a determination that is challenged in this action.

58.     Defendant Martin Kivell is the Chairperson of the Village of Airmont Zoning Board of Appeals, which issued a determination that is challenged in this action.

59.     Defendant Arthur Katz is a member of the Village of Airmont Zoning Board of Appeals, which issued a determination that is challenged in this action.

60.     Defendant Charles Picarelli is a member of the Village of Airmont Zoning Board of Appeals, which issued a determination that is challenged in this action.

61.     Defendant Laurie DiFrancesco is a member of the Village of Airmont Zoning Board of Appeals, which issued a determination that is challenged in this action.

62.     Defendant Scott Meier is a member of the Village of Airmont Zoning Board of Appeals, which issued a determination that is challenged in this action.

63.     Defendant Matt Ryan is an ad hoc member of the Village of Airmont Zoning Board of Appeals, which issued a determination that is challenged in this action.

64.     Defendant Linda Carbone is an ad hoc member of the Village of Airmont Zoning Board of Appeals, which issued a determination that is challenged in this action.

65.     Defendant Village of Airmont Planning Board is a village planning board duly organized under the laws of the State of New York.

66.     Defendant John Cornelius is a member of the Planning Board.

67.     Defendant Doug Whipple is a member of the Planning Board.

68.     Defendant Anthony Santucci is a member of the Planning Board.

69.     Defendant William Philip is a member of the Planning Board.

70.     Defendant Russell Hock is a member of the Planning Board.

71.     Defendant Pavle Lecei is an ad hoc member of the Planning Board.

72.     Defendant Ken Brezner is an ad hoc member of the Planning Board.

73.     Defendant Suzanne Carley is the clerk of the Planning Board.

74. Defendant Building Department of the Village of Airmont is the department that is responsible for code enforcement.

75. Defendant Louis Zummo is a Village Building Inspector of the Village of Airmont, New York.

76. Defendant Marino Fontana is a Code Enforcer for the Village of Airmont, is responsible for code enforcement in the Village, and issued the Notice of Violation that is the subject of this proceeding.

77. Defendant Suffern Central School District is a public-school district located within the County of Rockland, New York, with offices located at 45 Mountain Avenue, Hillburn, New York 10931.

78. Defendant Douglas S. Adams is the Superintendent of the Suffern Central School District.

## JURISDICTION AND VENUE

79. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, § 1343, and § 1367.

80. Venue in the Southern District of New York is based upon 28 U.S.C. § 1391(b). All Defendants reside in and the events or omissions giving rise to this action occurred in this District.

## FACTUAL BACKGROUND

### THE VILLAGE OF AIRMONT'S ANTI-HASIDIC FOUNDING

81. The Village of Airmont, in the Town of Ramapo in Rockland County, is a typical suburban neighborhood located three miles from Monsey.

82. In the mid-1980s, local residents realized that Orthodox Jews were moving in, and they began to devise strategies to impede Orthodox growth.

83.    Local residents formed the Airmont Civic Association, Inc. ("ACA") and began to push for Airmont's incorporation to take control of the local zoning and prohibit the kinds of home synagogues and multiple-family housing that are necessary to the practice of Hasidic Judaism.

84.    Indeed, the United States Court of Appeals for the Second Circuit described the ACA's mission as follows:

> Throughout the period prior to Airmont's incorporation, ACA emphasized the need for control over zoning in connection with the desire to keep Orthodox and Hasidic Jews out of the Airmont community. For example, ACA leaders polled Airmont residents as to their views, and one response, read aloud by ACA leaders at an August 1986 ACA meeting, stated as follows:
>
>> [W]hat would be better, for us to loose [sic] our homes for a religious sect or for us to live as we have lived for the past 25 years....
>>
>> ....
>>
>> .... [L]et the people in the unincorporated Area of Ramapo, go ahead and fight for what they believe in. Instead of giving up for what we've worked very hard for, to a bunch of people who insist on living in the past. I am not prejudice [sic] in any way, shape or form but i [sic] *will not* have a hasidic community in my backyard.
>
> (Emphasis in original.) The minutes of the same meeting forecast "a grim picture of a Hasidic belt from Rockland through Orange & Sullivan counties." At a September 1986 meeting shortly after a Hasidic developer had bought land in the Airmont area, one of those attending referred to that purchase and stated that "everybody knows ... why the Airmont Civic Association was formed. What does the Airmont Civic Association and the proposed village plan to do to keep these Hasidum [sic] out?"

*LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 418 (2d Cir. 1995).

85.    Airmont was then incorporated in 1991 for the sole purpose of enacting zoning regulations to exclude and discriminate against Hasidic Jews and restrict the use of rabbis' homes for prayer services.

86.     Airmont's discriminatory zoning polices have been the subject of multiple civil rights lawsuits, including two brought by the DOJ.

87.     *LeBlanc-Sternberg v. Fletcher* began in 1991 and appeared before the United States Court of Appeals for the Second Circuit twice.

88.     In *LeBlanc*, the Second Circuit held that "there was evidence that the events leading to the incorporation of the town and the implementation of its zoning code 'amply support a finding that the impetus [to form the town and implement the Code] was not a legitimate nondiscriminatory reason but rather an animosity toward Orthodox Jews as a group.'" 104 F.3d 355 (2d Cir. 1996) (quoting *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 431 (2d Cir. 1995)).

89.     The Second Circuit noted ample evidence to show that Airmont's zoning laws were enacted with an anti-Semitic animus. In fact, the Second Circuit listed some of the rampant anti-Semitic comments made by Village residents and officials alike.

90.     The Airmont mayor at the time described Hasidic Jews as "foreigners and interlopers," who were "ignorant and uneducated" and "an insult to" the Village. *LeBlanc-Sternberg*, 67 F.3d at 430.

91.     A Village trustee stated that "the only reason we formed this village is to keep those Jews from Williamsburg out of here." *Id.* Another Village trustee asserted that the "village did not 'have to pursue an Article 78 . . . there are other ways we can harass them.'" *Id.*

92.     At the conclusion of the *LeBlanc* litigation, the district court granted an injunction prohibiting Airmont from engaging in any conduct having the purpose or effect of perpetuating or promoting religious discrimination or of denying or abridging the right of any person to equal opportunity on account of religion.  The conduct prohibited included, but was not limited to,

interpreting any provision of the Airmont Zoning Code in a manner that discriminated against any person or group or persons on account of religion in connection with the planning, development, construction, acquisition, financing, operation or approval of any housing in Airmont, and taking any action which in any way makes unavailable housing to persons on the basis of religion. *U.S. v. Village of Airmont*, 925 F. Supp. 160, 161 (S.D.N.Y. 1996).

93.     The DOJ commenced a second action against the Village in 2005 after the Village of Airmont Planning Board denied an application by a Hasidic Jewish religious congregation to construct a yeshiva with accessory housing to educate Hasidic Jewish young men on a 19-acre parcel of property. *U.S. v. Village of Airmont*, No. 05-cv-05520-LAK-PED, Dkt. 53 (S.D.N.Y. May 6, 2011).

94.     Airmont finally settled that suit with the DOJ in 2011 and agreed to amend its zoning code to permit educational institutions with accessory housing, in compliance with RLUIPA and the FHA, and to include a grandfathering provision to allow the Congregation to build its yeshiva.

95.     Airmont's entire existence is predicated upon an animus against the Hasidic community, and now Airmont seeks to use its zoning and land use authority to once again stifle the growth of the Hasidic community in Airmont, this time targeting the education of Hasidic Jewish children.

### THE HISTORICAL USE OF CENTRAL UTA'S PROPERTY

96.     On or about August 26, 2016, Plaintiff Central UTA purchased a 21-acre parcel of real property located at 212/236 Cherry Lane in the Village of Airmont, New York (the "Property").

97.     The Property was formerly known as Camp Regesh, a 600-student summer camp founded in 1996.

98.     From 2001 until Central UTA purchased the Property, Ateres Bais Yaakov Academy ("Ateres"), a non-Hasidic, Jewish school rented Camp Regesh during the school year to operate a private school for girls.

99.     It was widely known within Airmont that the Property was used as both a school and a day camp. Before opening the school in 2001, Camp Regesh and Ateres applied to Defendant Village of Airmont Planning Board (the "Planning Board") for an amended site plan approval to use the Property as a private school and to add two new modular buildings to the site.

100.    In August 2001, the Village Planning Board approved the proposal.

101.    The Planning Board's 2001 amended site plan approval noted that "[t]he maximum number of students to be enrolled at any given time should not exceed 167 students."

102.    The 2001 Planning Board approval related only to the addition of the two modular buildings, each of which was capable of safely accommodating 96 people, and the renovation of two other buildings for use as school buildings.

103.    Thus, at most, the 167-student enrollment condition applied to those two new buildings. It did not restrict the Building Investigators' discretion to allow other buildings on the site to be used for school purposes without requiring an amended site plan approval and did not limit the total number of Hasidic Jewish children that may be educated on Central UTA's 21-acre Property.

104.    From 2001 until Central UTA purchased the Property, Ateres grew in both size and number. Before each expansion of student enrollment, Ateres applied to the appropriate

municipal authority, including the Planning Board and the Community Design Review Committee ("CDRC"), for and obtained the appropriate approvals without issue.

105.   Ian Smith was the Village of Airmont Building Inspector from 2005 to 2015 ("Building Inspector Smith"). Building Inspector Smith has extensive personal knowledge regarding the development of the Property.

106.   Building Inspector Smith determined that Ateres was not required to seek a site plan amendment for the building renovations, facility weatherization, and other general repairs and upgrades on the 21-acre Property.

107.   This determination was well within the Building Inspector's discretion under the Village Zoning Code § 210-72, which provides that an amended site plan is required only "where, in the judgment of the Building Inspector, there will be an increase in parking, traffic, water consumption, sewage effluent or other regulated activity."

108.   Before renovating facilities for school use or increasing the student population, Ateres applied for and received the proper permits and certificates of occupancy from the Building Inspector's Office.

109.   Building Inspector Smith issued multiple building permits for renovations of existing camp facilities and did not require an amendment to the approved site plan. Upon completion of each renovation, Building Inspector Smith inspected the building and issued certificates of occupancy.

110.   Building Inspector Smith issued two certificates of occupancy in 2005, the first for the addition of a swimming pool to the existing day camp/school and the second for the conversion of a garage to a kitchen in the existing day camp/school.

111.    Building Inspector Smith was well aware of the Planning Board's 2001 site plan approval and the condition purporting to limit student enrollment to 167 students.

112.    Building Inspector Smith knew that Ateres' student enrollment exceeded 167 students and did not require amendment to the Property's site plan.

113.    Because Camp Regesh hosted approximately 600 students on the Property even before the 2001 site plan was approved, Building Inspector Smith reasonably concluded that Ateres' increasing enrollment was lawful and did not require amendment to the site plan.

114.    Building Inspector Smith's determinations were never challenged.

115.    Indeed, Ateres' student enrollment numbers were well known.

116.    From 2009 until 2016, the Village of Airmont's Fire Inspector (the "Fire Inspector") inspected the Property annually and issued "Non-Public School Fire Safety Reports" to the New York State Education Department, which noted that approximately 400 students attended Ateres' school.

117.    No fire or safety violations were ever documented nor were there any allegations that the buildings on the property were unsafe for occupancy and use by approximately 400 students.

118.    During an October 2014 CDRC meeting, the CDRC acknowledged that 400 students attended Ateres.

119.    New York State Education Department records demonstrate that Ateres enrolled 415 students in the 2015-2016 academic year.

120.    Furthermore, Camp Regesh/Ateres operated on the same street as the Village of Airmont's Village Hall, rendering it virtually impossible that the Village did not know that approximately 400 students attended Ateres.

121.    Not only were Defendants well aware of the actual use of the Property, but at no point did any Village of Airmont municipal code enforcement official indicate that there were any concerns about, let alone zoning violations arising from, the operation of a school on the Property or the number of students in attendance.

### THE PRESERVE AIRMONT MOVEMENT CONTINUES THE DISCRIMINATORY MISSION OF THE ACA

122.    In late 2014, Philip Gigante and others formed the Preserve Airmont political party with the same discriminatory mission as the ACA, to use the Village's powers to keep Hasidic Jews out of Airmont.

123.    This time, instead of expressly disclosing their discriminatory motives, Preserve Airmont used coded language to promote the same discriminatory policies of the ACA that the Second Circuit condemned in *LeBlanc-Sternberg*.

124.    Preserve Airmont's mission includes "the preservation of our neighborhoods and securing the quality of life Airmont residents expect. This is accomplished through enforcement of our property maintenance and zoning codes" and "[s]trengthening zoning requirements to encourage a more rural environment." PreserveAirmont.org, *available at* http://www.preserveairmont.org (last accessed Nov. 28, 2018).

125.    These are the same policies the ACA used to prohibit the types of multi-family housing necessary to Hasidic Jewish life and are used by Preserve Airmont for the same discriminatory and exclusionary purpose now.

126.    In fact, in the race leading up to the 2015 Village elections, Preserve Airmont and then-mayoral candidate Gigante sent out a campaign flyer, and published it to their Facebook page, accusing their political opponents of doing "things the way they are done in **the Town of Ramapo**," meaning accommodating Hasidic Jewish families and their religious practice. Indeed,

23

the campaign flyer made Preserve Airmont's intent very clear, stating: "Didn't we form a Village to separate from the practices and financial irresponsibility of The **Town of Ramapo**?" Preserve Airmont Facebook post, Mar. 16, 2015, *available at* https://www.facebook.com/permalink.php?story_fbid=933392213358138&id=879396505424376 (last accessed Sept. 28, 2018).

127.   After Gigante's election as Village Mayor and Preserve Airmont's victory in the Village Trustee races, Preserve Airmont and Gigante reinvigorated the Village's and ACA's anti-Hasidic campaign of discrimination.

128.   During Village Trustees Paul Marchesani's and Anthony Valvano's 2017 campaign as the Preserve Airmont candidates for re-election, with the support of Mayor Gigante, they doubled down on Preserve Airmont's discriminatory "us versus them" rhetoric, attacking their political opponents for voting no on the building moratorium and supporting the land use policies of the Town of Ramapo, which have allowed housing and religious facilities for the Hasidic Jewish community to be built.

129.   Preserve Airmont's implication was clear: a vote for the Preserve Airmont candidates was a vote for excluding and limiting the growth of the Hasidic community.

130.   In fact, a political campaign attack advertisement against the Airmont Future Party, Preserve Airmont's opponents in the 2017 Village Trustee election, and in support of the Preserve Airmont candidates made that discriminatory message explicit. Against the backdrop of an atomic bomb mushroom cloud, the advertisement shows pictures of the Airmont Future Party candidates meeting with and receiving awards from the Congregation Echo Ridge, a Hasidic Jewish shul in Airmont, with the message "Let's play connect the dots."

131.   The attack advertisement's discriminatory message was unmistakable: a vote for Preserve Airmont's opponents will result in the Hasidic Jewish community destroying Airmont.

132.   That discriminatory campaign message has now been implemented as Airmont's official and established custom and practice of delaying, harassing, and preventing the Hasidic Jewish community's religious exercise, including Central UTA's private Hasidic Jewish religious school.

133.   Mayor Gigante even "lobbied the Town of Ramapo Assessors' office about some of the questionable tax exemptions that were given in error. As a result, many properties that were illegally exempt or exempt in error are back on the Village tax roll." PreserveAirmont.org, About Us, *available at* http://www.preserveairmont.org/?page_id=1650 (last accessed Nov. 28, 2018).

134.   One of the properties that Mayor Gigante and the Village defendants targeted for return to the tax rolls was the property used for Central UTA's plainly exempt Hasidic Jewish religious school.

135.   While the Village and the Preserve Airmont now use coded language to try to conceal their discriminatory motives, their discriminatory intent shines through.

### CENTRAL UTA'S INITIAL USE OF THE PROPERTY

136.   After Central UTA purchased the Property, it began to use it in the same manner as Ateres and continued school operations with fewer students.

137.   The primary difference between the schools was that Ateres educated Jewish children generally, while Central UTA educates children of the Hasidic Jewish community.

138.   Central UTA promptly received a Basic Educational Data System ("BEDS") Code, was approved for the child nutrition program, and the East Ramapo Central School

District ("East Ramapo Central") granted all requisite approvals to provide services, including for transportation and Pre-K education, to Central UTA's students.

139.    On July 20, 2016, a representative of Central UTA met with Village Mayor Philip Gigante to discuss future plans for the 21-acre Property.

140.    Central UTA and Mayor Gigante discussed how the Property had operated as a school and a day camp for 20 years, and Central UTA hoped to expand on that use. Central UTA planned to add a new building to the Property by 2018 and to replace some of the existing classrooms to update and accommodate for growth in enrollment by 2020.

141.    While the Village was once cooperative with Ateres in allowing the development and operation of the religious school, that ended once Mayor Gigante and Preserve Airmont were elected, Central UTA purchased the Property, opened its Hasidic Jewish religious school, and advised the Village of its plans to build new school buildings on the Property to accommodate its growing enrollment.

### THE VILLAGE OF AIRMONT'S COORDINATED CAMPAIGN AGAINST CENTRAL UTA'S RELIGIOUS SCHOOL

142.    The Village then began a coordinated crusade of dilatory and discriminatory tactics led by Mayor Gigante, the Village Attorney, the current Building Inspector Louis Zummo ("Building Inspector Zummo"), and the Code Enforcer Marino Fontana ("Code Enforcer Fontana") to prevent Central UTA from opening, operating, or expanding its religious school. At all times, Mayor Gigante, Building Inspector Zummo, and Code Enforcer Fontana acted pursuant to established custom and practice of the Village of Airmont and its Building Department to delay, harass, and prevent religious exercise by members of the Hasidic Jewish community and to deter them from living in Airmont.

143.    Since submission of its application for amended site plan approval, the expansion of Central UTA's Hasidic Jewish school has faced vehement opposition from local residents and Village officials alike. The opposition is not based not on any legitimate fiscal, environmental, or geographic concern, but solely upon the religious practices of the people whom the opponents fear will join their communities.

144.    Public comments have demonstrated that opposition to Central is premised on the religious beliefs of the Hasidic community.  For example, one opponent commented:

> The UTA of Monsey doesn't give a shit about anyone other than themselves and will lie, cheat and steal to get what they want. Unfortunately our town leadership seems okay with this. Where are the penalties? These crooks have proven themselves when st Lawrence was around yet town leadership has no comment in this article. Sounds to me that the current board is ok with the continuing games these crooks of UTA Monsey. When will people stand up and say enough is enough.... this is not anti semstism [sic], it's stopping thieves from taking over!!!

145.    As a small sample, other comments on news articles regarding Central UTA's project and in local social media groups have stated:

- "Very interesting ... this sound like SOP for the whole county... the ole shell game... with our neighborhoods..."

- "Agudath Israel of America is doing PR for the town now. There is no legal/political solution. Either 1) Extreme civil disobedience or 2) Get out while you can. Let them steal from each other until they drown in their own failing infrastructure."

- "They're living off hardworking taxpayers who know they can only afford a couple of kids or so to stay within their means and provide for their families. This cult just doesn't care children are a commodity a way to get more taxpayer dollars!"

- "Everywhere they go they bring pain and misery and they don't care how they disrupt your life or your neighborhood I know because they've done it to me. Trump is right, make them work for social services and the food stamps make them do anything for medicaide [sic] and you'll see how fast they'll start paying their own bills !!!!"

- "They do no [sic] assimilate. They acquire and run off people who comprise a community. They are stateless. But strength experts at getting themselves serves [sic]. Look to your zoning. Could be your final front."

- "Their aim is to overwhelm the good, the solid, the historically, inject it's own cultural DNA and destroy Suffern and environs. The nit collapses into the crumbling density of Shtetelopolis."

- "The once beautiful 202 area has been handed over to a religious sect that gives nothing back to a community and leaches on social services paid by its neighbors taxes. They are like a consuming plague."

*Airmont Seeks to Block Additional Development Through a Village-Wide Building Moratorium*

146. After Central UTA purchased the Property in August 2016, it began to prepare an application for the construction of two new school buildings, one to house a religious school for boys and the other a religious school for girls, consistent with Hasidic Jewish religious practice and custom.

147. The application is intended to allow Central UTA to replace its currently inadequate boys and girls school facilities.

148. For the first time, since the conclusion of the 2011 litigation when Airmont was forced to amend its zoning code, on September 19, 2016, the Village of Airmont Board of Trustees discussed implementing a building moratorium policy to develop a comprehensive plan and amend the zoning code. By later enacting the building moratorium, the Village of Airmont Board of Trustees acted with deliberate indifference to the rights of Plaintiffs.

149. This occurred less than a month after Central UTA closed on the Property,

150. At the September 19, 2016 meeting, a member of the Village of Airmont's Zoning Board of Appeals and CPUC, Laurie DiFrancesco, mentioned houses of worship as a part of the reason that the Village should impose a building moratorium until the Village proposes amendments to its comprehensive master plan. DiFrancesco was acting pursuant to established

custom and practice of the Village of Airmont and its Zoning Board of Appeals to delay, harass, and prevent Hasidic Jewish residents from freely exercising their religion in Airmont.

151.    Restricting the use of property for religious practice is patently illegal, and has been repeatedly struck down by the New York State and federal courts. Yet, the Village unlawfully utilized zoning and regulatory schemes to deny Central UTA use of its property solely because it serves the Hasidic Jewish community.

152.    On February 8, 2017, the Board of Trustees passed an interim land use development moratorium and on March 8, 2017 the State of New York accepted Village Local Law No. 1 of 2017 ("Local Law No. 1"), placing a moratorium on development in all zoning districts in the Village. Each member of the Village Board of Trustees acted with deliberate indifference to the rights of Plaintiffs by enacting and repeatedly extending the moratorium.

153.    Local Law No. 1 established a Village-wide moratorium suspending the receipt, consideration, or issuance of approval of *all* residential and non-residential subdivisions and other development in all zoning districts "while the Village considers potential changes to its comprehensive plan and considers and adopts changes to its land use regulations."

154.    The moratorium prevented Central UTA from rehabilitating its inadequate school facilities.

155.    The moratorium was to last six months by its terms, with the possibility of one extension by the Village Board of Trustees for good cause.

156.    The Board of Trustees extended the moratorium three times, and it remained in place a year and a half after its enactment. These actions were in furtherance of the policy of the Board of Trustees to delay, harass, and prevent Hasidic Jewish residents from freely exercising their religion in Airmont.

157.   Local Law No. 1 further stated that the moratorium was issued to "preserve the status quo pending the adoption of amended planning and zoning regulations in accordance with the new comprehensive plan, namely: 1. Preserve the suburban and remaining semi-rural character of the Village; 2. Develop zoning and building regulations that reduce or restrict odors, sounds, commercial traffic, light pollution and other negative environmental impacts on residential areas; 3. Expand initiatives to safeguard neighborhoods from inappropriately scaled development."

158.   Local Law No. 1 also stated that Airmont sought to rewrite substantially its planning and zoning regulations to resolve multiple issues and outstanding matters with the Village Code that have resulted in confusion and "litigation throughout past years."

159.   Any "litigation throughout past years" has been brought primarily in relation to Jewish-owned properties and the inappropriate exercise of Airmont's zoning laws against them.

160.   On July 19, 2017, Village of Airmont Comprehensive Plan Steering Committee conducted a public open house workshop to gather public input, opinion, sentiment, and feedback regarding the current state of the Village and opportunities and challenges that the Village faces.

161.   Almost a year later, on June 18, 2018, the CPUC held a public hearing on the proposed comprehensive plan for the Village. The proposed plan has not yet been submitted to the Planning Board for review, nor to the Village Board for approval.

162.   In the proposed comprehensive plan, Central UTA's 21-acre Property is designated as "Private Recreation/ Open Space," rather than as a private religious school.

163.   There is no dispute, however, that a religious school has operated on the Property continuously since 2001.

164.    In contrast, the public Cherry Lane Elementary School, in the Suffern Central School District, which is directly across the street from the Property, is properly classified as a "School."

165.    Further, the Village proposed local wetlands regulations that included substantial buffer areas in which any development would be prohibited.

166.    This proposed regulation was designed to restrict substantial development on Central UTA's property, which has wetlands running through the middle of its property.

167.    In fact, when the CPUC was discussing the changes, one member repeatedly noted that the strict wetlands regulations prohibiting development were included at the direction of Village Mayor Gigante, and that she saw no environmental need to increasing the wetlands restrictions in the Village.

168.    In giving his direction, Mayor Gigante was acting pursuant to established custom and practice of the Village to delay, harass, and prevent religious exercise through discriminatory land use regulations.

169.    Although the proposed wetlands regulations amendments were ultimately dropped from the Village Board's enactment of zoning changes on September 4, 2018, the Village has stated its intent to adopt the wetlands regulations amendments separately before the end of 2018.

170.    Similarly, Central UTA applied to renovate an existing building on its site that the Building Inspector had determined needed improvements before it could be occupied for school use.  The Building Inspector, however, verbally denied the permit application because Central UTA was educating 200 to 300 students at the school.

171.    The Village has, thus, not only stopped Central UTA from using buildings on its Property for the religious school, but also prevented it from undertaking the improvements that would allow the inadequate facilities to be renovated and returned to productive use.

172.    The same is true for Central UTA's boys school, which is currently operating in inadequate school facilities and is prevented from enrolling additional students as a result of the Village's illegal campaign of discrimination against Central UTA.

173.    There is simply no reasonable doubt that Local Law No. 1 was enacted to impair Plaintiffs' constitutionally vested rights, to prevent the development of a religious school, to exclude Hasidic Jewish individuals from the Village, and to block uses of land necessary for the practice of Hasidic Judaism.

**The Village Refuses to Issue Routine Approvals to Central UTA's Religious School and Delays Review of Central UTA's Proposal to Build New School Buildings**

*Stalling by the CDRC*

174.    Local Law No. 1 exempted, in relevant part, complete applications containing all required submissions to the Community Design Review Committee ("CDRC"), the Planning Board, Architectural Review Committee, and/or Zoning Board of Appeals.

175.    Just before adoption of the building moratorium, Central UTA submitted an application, on November 24, 2016, for an amendment to the Property's site plan for the two new school buildings to the CDRC for review and approval.

176.    Central UTA's school buildings application was, therefore, exempt from the Village building moratorium.

177.    Notwithstanding, the Village used numerous other dilatory customs to otherwise impede Central UTA's ability to proceed with the site plan amendment application.

178.    For example, at a December 12, 2016 meeting of the CDRC, the CDRC chastised Central UTA for failing to have a fire inspection or operating permit, which if required, would render its application incomplete and subject Central UTA to the building moratorium.

179.    Central UTA explained that it was unable to obtain a fire inspection from the Village because the Village had not yet hired a new Fire Inspector at the time that Central UTA closed on the property.  Central UTA instead was required to obtain the inspection from a private fire inspector.

180.    Central UTA asserted that the Village Zoning Law did not require an operating permit for the current school facilities. (Village Zoning Law § 89-9).

181.    The Tallman Fire Department also sent a letter to the meeting requesting that Central UTA provide 487 parking lot spots, make Cherry Lane wider, and add sidewalks. This is an untenable and unreasonable request; there is no need for 487 parking lot spots at the school. Rather, the school needs appropriately sized pick up and drop off locations, which is included in Central UTA's amended site plan.

182.    The CDRC did not make a decision regarding Central UTA's building application.

183.    On May 9, 2017, CDRC reviewed Central UTA's application again.

184.    During that meeting, Building Inspector Zummo noted that the Property's 2001 site plan only listed 167 students for enrollment.

185.    When the CDRC inquired whether the Property and facilities were safe, Building Inspector Zummo and Fire Inspector Shlomo Pomeranz (the "Fire Inspector") both indicated that they were, and the Fire Inspector stressed that Central UTA had been cooperative.

186.    The CDRC has since refused to make any recommendations on the Project or refer it back to the Planning Board, focusing its inquiry instead on a pending notice of violation relating to the number of students enrolled at the school.

*Requiring and Withholding an Operating Permit*

187.    In January 2017, the Planning and Zoning clerk advised Central UTA that, in order for its CDRC application to proceed, Central UTA would have to acquire an operating permit from Building Inspector Zummo.

188.     Central UTA asserted once again that it believed it did not need an operating permit for its current school facilities.

189.    Review of the Village Zoning Law's requirements for an operating permit makes clear that no such permit is required for Central UTA's current school buildings (Village Zoning Law § 89-9).

190.    Indeed, operating permits are only required for dangerous operations, such as handling of hazardous materials, pyrotechnics, large assembly halls, and dangers to public health. Central UTA's Hasidic Jewish religious school plainly is not such a dangerous operation as would require an operating permit under the Village Zoning Law.

191.    Even though an operating permit is not actually required, Central UTA tried to work with the Village and submitted an application to the Building Department clerk for an operating permit on March 9, 2017.

192.    The Building Department clerk subsequently resigned and Central UTA's application was never processed.

193.    On or about May 4, 2017, Building Inspector Zummo claimed that Central UTA never applied for an operating permit. In doing so, Building Inspector Zummo was acting

34

pursuant to the established custom and practice of the Village and its Building Department to discriminate against Hasidic Jewish residents by delaying and preventing the legal use of property.

194.    Again, Central UTA was forced to provide the Village with its own records to show the new Planning and Zoning clerk that it had applied for an operating permit.

195.    After again requesting an operating permit from Building Inspector Zummo, three months after the application was first submitted, the Building Inspector inspected the Property and issued no violations.

196.    Building Inspector Zummo nevertheless informed Central UTA that the Village Attorney Sean Mack ("Village Attorney Mack") advised him not to issue the operating permit because it would eliminate the Planning Board's ability to restrict enrollment to 167 students. Village Attorney Mack and Building Inspector Zummo acted pursuant to the established custom and practice of the Village of Airmont and its Building Department of targeting Hasidic Jewish residents and denying them religious exercise through illegal land use regulations.

197.    As far as Plaintiffs are aware, the Village has never required anyone to obtain an operating permit unless they conduct the activities or use the categories of buildings outlined in Village Zoning Law § 89-9.

198.    Plaintiffs' religious school does not require an operating permit under Village Zoning Law § 89-9.

*Obstruction of Fire Certificates*

199.    Building Inspector Zummo also prevented Central UTA's from obtaining fire certificates for all of Central UTA's facilities and his actions were pursuant to the established

custom and practice of the Village and its Building Department to delay, harass, and prevent Hasidic Jewish residents from exercising their religion through the legal use of property.

200.    After postponing the inspection, in late March 2017, the Fire Inspector visited the Property.

201.    Central UTA worked diligently with the Fire Inspector to remedy all concerns that were identified.

202.    Finally, on July 5, 2017, Fire Inspector Pomeranz issued fire certificates for all of the buildings on the Property except buildings 2 and 3.

203.    Fire Inspector Pomeranz noted that Building Inspector Zummo wanted to review the buildings and reports and had still not made a determination for buildings 2 or 3.

204.    After receiving the fire certificates for most of the buildings, Central UTA spoke with Building Inspector Zummo requesting issuance of an operating permit for the Property and a permit to renovate building 2.

205.    Building Inspector Zummo stated that Village Attorney Mack advised Building Inspector Zummo not to issue an operating or building permit to Central UTA. Building Inspector Zummo and Village Attorney Mack acted pursuant to established custom and practice of the Village and its Building Department to delay, harass, and prevent Hasidic Jewish residents from exercising their religion.

*Stonewalling Planning Board Meetings*

206.    On December 22, 2016, Central UTA submitted an informal application to the Planning Board while the application before the CDRC remained pending.

207.    The Planning Board's meeting, originally scheduled for January 26, 2017, was postponed three times.

208.    Village officials and the local paper, *The Rockland Star*, drummed up vehement local opposition to Central UTA's application by falsely claiming that Central UTA currently enrolled 800 students, and was seeking to enroll 2,000 by 2020. They also falsely claimed that Central UTA was intentionally evading zoning and building laws.

209.    The Village officials' actions were intended to increase opposition to Central UTA's application and to give the Planning Board justification for delaying its consideration of the proposal to build new school buildings.

210.    The Planning Board had notice well in advance of the meeting to consider Central UTA's application that it would need to host the meeting in a larger space due to the opposition.

211.    Indeed, Defendant Daniel Kraushaar, Deputy Village Attorney ("Deputy Attorney Kraushaar") wrote an email on January 7, almost three weeks before the meeting, claiming that "We have an application on for a 2000-person school, which might even lead to the meeting having to be adjourned due to lack of space for the people showing up for such a large project."

212.    Rather than make appropriate arrangements to find a larger space, the Planning Board has simply adjourned and evaded every meeting scheduled to address Central UTA's application.

213.    At the March 16, 2017 meeting of the Planning Board, the Village had not retained a traffic consultant to review Central UTA's application or received any substantive comments on it. The Board thus adjourned consideration of Central UTA's application.

214.    Eventually on May 25, 2017, the Planning Board convened a meeting to hear Central UTA's presentation on the project. Although Central UTA's consultants gave a very detailed presentation of the proposed school buildings, the Planning Board had absolutely no

comments, which is very unusual for the Planning Board members. The Planning Board also advised that it still had no retained a traffic consultant to review Central UTA's proposal.

215.    Suffern Central also sent a letter to the Planning Board opposing Central UTA's project and urging the Planning Board to deny it because the Central UTA students' rights under the New York Education Law to receive textbooks and transportation services would have a negative impact on Suffern Central's budget.

216.    Suffern Central also stated that it believed that Central UTA's 21-acre property was not suited for Central UTA's school, notwithstanding that it has a public elementary school that has enrolled more than 300 students on a 5.66-acre property—approximately one-quarter of the size of Central UTA's—located just across the street on Cherry Lane in the Village.

**The Village Issues a Patently Illegal Notice of Violation Against Central UTA**

217.    Defendants' crusade against Central UTA continued on August 5, 2017, when Central UTA received a Notice of Violation issued by Code Enforcer Fontana. By issuing the Notice of Violation, Code Enforcer Fontana was acting pursuant to the custom and practice of the Village and its Building Department to delay, harass, and prevent religious exercise of Hasidic Jewish residents of Airmont.

218.    The Notice of Violation states that "[a]ccording to the code violations, on May 9[th] 'The owner/representative admitted at a May 9, 2017 Community Design Review Committee (CDRC) meeting to operating a school for 200 to 300 students. 236 Cherry Lane does not have a Certificate of Occupancy to operate a school for 200 to 300 students.'"

219.    It is well established that a planning board may only attach conditions to an approval, and the Building Inspector may only enforce them, if the conditions find support in the Village's zoning ordinance.

220.    The Village of Airmont's zoning ordinance, however, contains no provision that limits the number of students that may attend a school. Therefore, pursuant to Airmont's widespread practice of obstructing Hasidic Jewish religious exercise, the Building Inspector enforced post hoc discriminatory regulations.

221.    Airmont Village Law § 210-149 states that a certificate of occupancy certifies that a building has been completed in accordance with the building and zoning permits issued, safety codes, and approved building plans.

222.    A certificate of occupancy permits occupancy of a particular building for a particular use; it does not impose any limitation on the maximum occupancy of an entire parcel of property or the particular use to which it is devoted.

223.    It is the New York State Uniform Fire Prevention and Building Code that requires annual reviews of and regulates the number of people that may safely occupy a particular building, such as a school building. (See New York Executive Law § 378; 8 NYCRR § 155.8).

224.    The school has been inspected by the Village's fire inspector every year, and has passed each inspection.

225.    No valid provision of law, therefore, exists to support the ZBA's determination that the maximum number of students that may attend Central UTA's religious school is somehow limited to the 167 specified in the 2001 site plan approval.

226.    The ZBA's decision contravenes virtually every decision made by Building Inspector Smith with respect to the Property over the course of ten years, and ignores all prior fire safety certifications for the Property after 2001.

227.    As such, Central UTA filed a timely appeal of the 2017 Notice of Violation and sought a determination on Building Inspector Zummo's findings to the Village ZBA. Thereafter,

on February 22, 2018, Central UTA sent a letter to Suffern Central School District and the Village ZBA reaffirming its position.

228.     On January 11, 2018, the Village ZBA met for the first time to discuss the Notice of Violation, but did not reach a decision, and met again on March 8, 2018.

229.     On May 16, 2018, the Village ZBA announced its decision to affirm the Notice of Violation but did not provide any reasoning for its decision at the meeting.

230.     On June 15, 2018, Central UTA commenced an Article 78 proceeding in the New York, Rockland County Supreme Court seeking to annul the Village ZBA's decision.

231.     Almost a year after issuing the Notice of Violation, the Village ZBA finally issued a post hoc written decision upholding the Notice of Violation on July 12, 2018, after Central UTA filed suit.

232.     Central UTA faces over $2 million dollars in fines as a result of the Notice of Violation, has reduced the number of students it may enroll and charge tuition to, lost its construction loan as a result of the Village's actions, is unable to acquire clear title on the Property in order to refinance the loan, and, consequently, is defaulting on its mortgage.

233.     *The Rockland Star* ran an article concerning the Notice of Violation and suggested that the violations would require Central UTA to restart its amended site approval applications before the CDRC and Planning Board, which would have subjected Central UTA to the moratorium.

234.     Preserve Airmont shared the *Rockland Star* article on its Facebook page, and admitted that Central UTA's property had been used as a private school before Central UTA bought it.

235.    The Village abused the building moratorium imposed by Local Law No. 1 to stall Central UTA's application for the maintenance and renovation of the religious school's inadequate facilities.

236.    As result of these unlawful actions, Central UTA was unable to obtain routine approvals for almost two years, and numerous parents, including Mr. and Mrs. Werzberger and the other individual Plaintiffs, have not been able to send their children to the religious private school.

237.    For example, Mr. and Mrs. Werzberger were forced to enroll their son in a private Hasidic Jewish boys school more than 30 minutes away from their home because the Village has unlawfully delayed and prevented Central UTA from building the two new school buildings on its property and renovating its existing facilities, forcing Central UTA's boys school to deny enrollment to additional students due to inadequate facilities.

238.    The net effect of these actions is that the Village is effectively preventing the construction and operation of a private religious school within the Village limits, thereby substantially burdening the religious exercise of the students who would attend the school.

### THE VILLAGE CONSPIRED WITH OTHERS TO DENY PLAINTIFFS' RIGHTS

**Suffern Central School District and Village Officials Conspire to Withhold Services from Students at Central UTA's Hasidic School**

239.    Central UTA, Mr. and Mrs. Werzberger and other individual Plaintiffs, and many families that attend or would attend Central UTA are located within Suffern Central School District ("Suffern Central"), formerly known as the Ramapo Central School District.

240.    Central UTA and Mr. and Mrs. Landau are entitled to receipt of special needs services and equipment from Suffern Central.

241.    Ateres likewise had a number of students from Suffern Central and received transportation services from the district throughout its time in operation.

242.    Central UTA contacted Suffern Central in order to register the school and confirm continued receipt of transportation services for students residing in Suffern Central's school district. Central UTA also sought services for special needs students from Suffern Central's district.

243.    Plaintiffs Cheskel and Henny Werzberger, Mordechi and Rachel Eger, Alexander and Sara Sicherman, Chaim and Chaya Wercberger, Ruben and Baila Werczberger, Joel and Rivky Gross, and Joel and Esty Werzberger all requested that Suffern Central provide transportation services for their children to Central UTA.

244.    Unlike East Ramapo Central, however, Suffern Central, after consulting with Village officials, took issue with Central UTA's 2005 Certificates of Occupancy ("2005 Certificates of Occupancy") and refused to provide transportation services to the students attending Central UTA.

245.    Further, Plaintiffs Hershel and Malka Landau contacted both East Ramapo Central and Suffern Central to obtain a necessary FM System for their 8-year-old, hearing-impaired daughter, R.L.

246.    Both New York and federal law require the school district in which the private school is located, here Suffern Central, to provide applicable special needs services in the location most appropriate for the child's individual educational needs in the least restrictive environment.

247.    The Landau family has attempted to acquire services, including speech services and use of an FM system, from Suffern Central for two years. Rather than assist R.L. with her

disability, Suffern Central has either completely ignored or offered entirely unworkable options for R.L.'s education.

248.    Suffern Central offered only to provide services to R.L. at Suffern Central's public school buildings in large groups with other public school students, both in violation of state and federal law as well as the Landau family's religious beliefs.

249.    Offering speech therapy only at Suffern Central would require R.L. to withdraw from the school her parents selected for her in order to receive the required special needs services, in clear violation of well-established educational laws and standards.

250.    Furthermore, R.L. is not able to attend Suffern Central because of her religious beliefs. R.L.'s religious beliefs require regular study of the Torah and the separate education of boys and girls during school hours. These requirements are integral components of the Landau family's exercise of its religious beliefs.

251.    Indeed, in an effort to assist R.L. and expedite the process, East Ramapo has met with R.L., East Ramapo's audiologist has sent in requests to Suffern Central for services on behalf of R.L., the Landau family has requested that Suffern Central develop an individualized education program for R.L., and East Ramapo Central has even offered to order and pay for the FM System for Suffern Central.

252.    Suffern Central continues to withhold necessary special needs education services from R.L. and has refused to provide an individual to set up and maintain the necessary FM system for use by R.L. in Central UTA's school, notwithstanding that it was fully paid for by East Ramapo Central, the school district where the child lives.

253.   Suffern Central has also consistently asserted that it may not provide these necessary services to Central UTA because, it claims, Central UTA does not have the proper Certificates of Occupancy.

254.   Although the Property had served as a school for over 15 years and Suffern Central provided transportation and special needs services to Ateres, Suffern Central at first refused to provide the transportation and special education services guaranteed to all private school students in the state, because the Village Building Inspector refused to certify that Central UTA's school complied with the Village's zoning. Building Inspector Zummo based his refusal on an alleged misspelling of "school" as "schull" on one of Central UTA's certificates of occupancy.

255.   Based upon that error, the Village and Suffern Central claimed that Central UTA did not have a valid Certificate of Occupancy showing that the Property was approved for a school and educational use.

256.   Consequently, in September of 2016, Suffern Central declined to provide transportation and special needs services to the school.

257.   In an effort to cooperate with Suffern Central, in November 2016, Central UTA resubmitted its Fire Report, Certificate of Occupancy, and School Information Request form along with a letter from Building Inspector Smith indicating that facility was approved for a school.

258.   Suffern Central would not accept Building Inspector Smith's letter. Instead, Suffern Central claimed that they contacted the Village of Airmont and requested additional documentation from Building Inspector Zummo.

44

259.    Throughout December 2016, both Suffern Central and Building Inspector Zummo claimed that the Certificates of Occupancy demonstrated that the Property was not approved for a school based upon the spelling error. Building Inspector Zummo was acting pursuant to established custom and practice of the Village to delay, harass, and prevent religious exercise of the Hasidic Jewish community.

260.    Eventually, Central UTA located a Certificate of Occupancy dated October 24, 2001 ("2001 Certificate of Occupancy"), which was issued for "Modular Building #61 as shown on the site plan for use as classrooms for girls' school as per planning board approval."

261.    That Certificate of Occupancy, however, listed the address for the Property as 212 Cherry Lane rather than 236 Cherry Lane, and Building Inspector Zummo rejected that Certificate of Occupancy as well.

262.    Because Central UTA's 21-acre property is large, it had been issued two different street addresses—212 and 236 Cherry Lane—but remained a single integrated lot.

263.    In January 2017, Central UTA wrote to Deputy Attorney Kraushaar for the Village of Airmont, explaining that the 2001 Certificate of Occupancy likely listed 212 Cherry Lane as the address rather than 236 Cherry Lane because the subject parcel contains over 1,000 feet along Cherry Lane and, in 2001, multiple addresses may have been assigned to the parcel.

264.    Central UTA made clear that the Property was a single tax parcel commonly identified as either 212 or 236 Cherry Lane. Central UTA also reiterated that the 2005 Certificates of Occupancy contained a typographical error and that "schull" was clearly intended to mean "school" given the well-known use of the Property.

265.    Deputy Attorney Kraushaar never responded and never attempted to clarify the issue with either the Building Inspector or Suffern Central. By ignoring Central UTA, Deputy

Attorney Kraushaar was acting pursuant to the Village's custom and practice of delaying, harassing, and preventing religious exercise of the Hasidic Jewish residents of Airmont.

266.     In February 2017, Central UTA sent the 2001 Certificate of Occupancy and explanation regarding the address discrepancy to Suffern Central.

267.     Central UTA further provided Orange and Rockland meter bills to show that the County recognized that 212 and 236 Cherry Lane refer to the same 21-acre parcel of property.

268.     On or about March 2, 2017, Suffern Central rejected the 2001 Certificate of Occupancy because Building Inspector Zummo incorrectly stated that the Certificate of Occupancy for 212 Cherry Lane was not valid for 236 Cherry Lane. Building Inspector Zummo's determination was made pursuant to the established custom and practice of the Village and its Building Department to delay, harass, and prevent Hasidic Jewish residents from freely practicing their religion in Airmont.

269.     In response, Central UTA was forced to produce additional records demonstrating ongoing use of the Property as a school. Central UTA provided Central Suffern with yet another Certificate of Occupancy that was issued to Ateres on or about October 19, 2001 that was specifically for 236 Cherry Lane, tax parcel 18-217A1B.  The Certificate of Occupancy was an approval for "2-55,000 B.T.U. Heating furnaces in building #27 of girl's grade school," making it particularly clear that the school was indeed an approved use.

270.     In May 2017, Central UTA sent the October 19, 2001 Certificate of Occupancy to Suffern Central with the hopes of finally receiving the transportation and special needs services duly owed.

271.     Once again Suffern Central refused to provide these services. After confirming that the October 19, 2001 Certificate of Occupancy was valid, Suffern Central stated that Central

UTA submitted a Certificate of Occupancy for building #28, whereas the original documentation was for building #11 on the Property. As such, Suffern Central requested a current Fire Safety Certificate for building #28.

272.    Both Central UTA and the Fire Inspector provided Suffern Central with fire certificates for the buildings on the Property, as well as an explanation that the buildings have been renumbered since 2001 and provided corresponding maps.

273.    Suffern Central was also provided with a copy of the 2001 site plan approval that specifically authorized the use of Central UTA's property as a school.

274.    Nevertheless, Suffern Central once again denied Central UTA's registration and refused to provide services because it did not have "municipal approvals."

275.    It has been two years since its original application, and Suffern Central has still not provided any services to Central UTA.

276.    On April 19, 2018, and again on July 16, 2018, Suffern Central sent letters to Central UTA insisting that it does not have current fire inspection reports or valid certificates of occupancy and requiring a certificate of occupancy for every structure on the Property.

277.    Suffern Central also denied the individual Plaintiffs' requests for transportation services for their children.

278.    These actions have caused injury to the individual Plaintiffs who requested transportation services for their children.

279.    For example, Mr. and Mrs. Werzberger must pay for transportation of their two school-aged daughters who attend the Central UTA girls school at significant expense because of Suffern Central's unlawful denial of transportation services.

280.    Upon information and belief, Suffern Central provides transportation and special education services to students of both public and other private non-Hasidic Jewish religious schools without delay or obstruction.

281.    Plaintiffs have repeatedly requested that the Village provide all certificates of occupancy for the existing structures on the Property, but the Defendants have failed to maintain all of the records that Suffern Central has required to provide vital services.

**The Village Attempts to Have Central UTA's Property Tax Exemption Revoked**

282.    The Village's campaign against Central UTA even included illegally attacking its real property tax exemption for the religious school.

283.    At the January 2018 meeting of the Village Board, the Board members began discussing the process how to have property owners' exemption from real property taxes revoked.

284.    As the Board members explained, the Village first had to issue notices of violation for a violation of the zoning law, and then refer those violations to the Town of Ramapo to remove the properties tax exemptions and return them to the rolls.

285.    After issuing Central UTA the Notice of Violation, the Village did exactly that. On March 1, 2018, the date on which all real property exemption applications must be filed with the Town, the Village, copying the Village Clerk, Village Attorney Mack, and Mayor Gigante, advised the Town Assessor that Central UTA's Property, and the property of a Hasidic Jewish house of worship, were "receiving tax exemptions without certificates of occupancy and are currently in violation."

286.    Accordingly, the Village directed the Town Assessor to "[p]lease adjust the tax rolls accordingly," that is, to revoke Central UTA's real property tax exemption.

287.    After the Town Assessor's office requested additional documentation from the Village to support the claimed violation, the Village provided the Notice of Violation and advised that Central UTA had appealed to the Village ZBA.

288.    The Town Assessor complied with the Village's direction and revoked Central UTA's tax exemption.

289.    After the Village ZBA irrationally upheld the Notice of Violation, the Village advised the Town Assessor of the decision and that Central UTA remained in violation of its certificate of occupancy.

290.    As a result of the Village's discriminatory campaign, Central UTA was forced to grieve the assessment of taxes against the Property to restore its exemption pursuant to New York Real Property Tax Law § 420-a.

291.    The Town of Ramapo, eschewing the Village's discriminatory campaign, ultimately reversed its decision and restored Central UTA's real property tax exemption.

292.    Plainly, there is no length to which the Village will not go to harass and discriminate against Plaintiffs in the exercise of their constitutional rights.

### AS AND FOR A FIRST CAUSE OF ACTION
#### "Substantial Burden"
### Religious Land Use and Institutionalized Persons Act of 2000
### 42 U.S.C. § 2000cc-2(a)

293.    Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

294.    Hasidic Jewish religion and culture require religious single-sex schools for the education of Hasidic Jewish children.

295. The development of the private religious school constitutes protected religious exercise within the meaning of RLUIPA.

296. The use of the Property located at 212/236 Cherry Lane in the Village of Airmont for a private religious school is a permitted use within the zone in which the Property is located and no use variance is required.

297. Central UTA purchased the 21-acre Property in 2016 and opened a private religious school and enrolled between 200-300 students.

298. There is no compelling governmental interest justifying the delay of Central UTA's application to expand Central UTA's religious school.

299. Furthermore, as discussed above, Defendants' failure to review Central UTA's proposal to build two new school buildings for almost two years, the basis for the moratorium, and the Planning Board's failure to meet, were instituted for the sole purpose of stopping the expansion of the private religious school and other Jewish owned businesses.

300. Defendants' intention of blocking the operation of the religious school is evidenced by the timing and circumstances surrounding the enactment of the local laws and actions of local government.

301. Defendants continue to stall any and all decisions regarding Central UTA's school by seeking new requirements from Plaintiffs at every turn.

302. The Village of Airmont, its Board of Trustees, its Zoning Board of Appeals, and its Building Department have a widespread custom and practice of substantially delaying or preventing the religious exercise of members of the Hasidic Jewish community.

303. Suffern Central has a custom and practice of delaying and denying Hasidic Jewish students transportation and special education services on the basis of religion.

304.    Central UTA's application has become futile as a matter of law, because it is inevitable that the Village Planning Board will refuse the application, taking into consideration the record of the Village Defendants' hostility, delay, and obstruction.

305.    Defendant Village Zoning Board of Appeals' decision upholding the Notice of Violation and actions deprived and continue to deprive the Plaintiffs of their right to freedom of intimate association and freedom of expressive association, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment, by intruding upon the Plaintiffs' right to associate for purposes of protected expressive activity.

306.    By refusing to uphold the previous determinations made by Building Inspector Smith, Defendant Village Zoning Board of Appeals is preventing Plaintiffs from practicing their religion.

307.    The Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendant Village Zoning Board of Appeals' violation of their constitutional rights.

308.    Defendant Village Zoning Board of Appeals has caused the Plaintiffs to suffer, and to continue to suffer, irreparable harm, damage and injury.  The Plaintiffs will continue to suffer such damages unless the Defendants' acts and conduct complained of are permanently enjoined.

309.    Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations, including the building moratorium and the enrollment restriction, in a manner that places a substantial burden on the Plaintiffs' religious exercise without any compelling interest, and without using the least restrictive means of furthering any compelling interest.

310.    Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' violation of their constitutional rights.

311.    Defendants have caused Plaintiffs to suffer, and to continue to suffer, irreparable harm, damage, and injury.  Plaintiffs will continue to suffer damages unless Defendants' acts and conduct complained of are permanently enjoined.

**AS AND FOR A SECOND CAUSE OF ACTION**
**"Equal Terms"**
**Religious Land Use and Institutionalized Persons Act of 2000**
**42 U.S.C. § 2000cc-2(b)(1)**

312.    Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

313.    Hasidic Jewish religion and culture require religious single sex schools for the education of Hasidic Jewish children.

314.    The development, operation, and expansion of the private religious school constitutes protected religious exercise within the meaning of RLUIPA.

315.    The use of the Property located at 212/236 Cherry Lane for a private religious school is a permitted use within the zone in which the property is located and no use variance is required.

316.    Indeed, the Property served as a private religious school and day camp with more than 400 students enrolled for 15 years before Central UTA acquired the Property.

317.    At no time prior to Central UTA's purchase of the Property and operation of a Hasidic Jewish religious school did the Village enforce any condition on the total enrollment of Ateres' religious school.

318.    Ateres was permitted to renovate numerous buildings on the Property to serve its growing student population, while the Village has unduly enforced the moratorium, the illegal

total student enrollment condition, and other local laws to restrict Central UTA's development of adequate school facilities.

319.     The only difference between Ateres' religious school and Central UTA's is that Central UTA educates Hasidic Jewish children, whereas Ateres educated non-Hasidic Jewish children.

320.     Furthermore, the Cherry Lane Elementary School, which is one of Suffern Central's primary schools, is located across the street on the same road as Central UTA's Property and has enrolled more than 300 students on a 5.66-acre property, upon information and belief, without the Village imposing any restriction on the total number of students it may enroll.

321.     In fact, the Cherry Lane Elementary School has averaged more than 430 students enrolled per year since the 1998-99 school year.

322.     According to the latest data from the New York State Department of Education, the Cherry Lane Elementary School has enrolled the following number of students each year:

|  | Enrollment |
|---:|:---:|
| 2016-17 | 305 |
| 2015-16 | 356 |
| 2014-15 | 384 |
| 2013-14 | 418 |
| 2012-13 | 421 |
| 2011-12 | 422 |
| 2010-11 | 472 |
| 2009-10 | 452 |
| 2008-09 | 465 |

| | |
|---|---|
| 2007-08 | 470 |
| 2006-07 | 465 |
| 2005-06 | 427 |
| 2004-05 | 391 |
| 2003-04 | 415 |
| 2002-03 | 427 |
| 2001-02 | 488 |
| 2000-01 | 494 |
| 1999-00 | 490 |
| 1998-99 | 499 |

323.    Central UTA's Property is almost four times the size of the Cherry Lane Elementary School's, yet the Village has attempted to prohibit Central UTA from educating more than 167 Hasidic Jewish students at its private religious school.

324.    The only difference between the Cherry Lane Elementary School and Central UTA's is that Central UTA is a private religious school that educates Hasidic Jewish children, whereas Cherry Lane is a public school that educates secular students.

325.    There is no compelling governmental interest justifying the enforcement of an enrollment restriction on Central UTA's private religious school.

326.    From the Village's inception, Defendants have made countless and continuous efforts to frustrated and prevent the development of Hasidic Jewish-owned properties.

327.    Defendants have deprived and continue to deprive Plaintiffs, including Central UTA, a religious institution, of their right to the free exercise of religion, as secured by RLUIPA,

by imposing and implementing land use regulations, including the building moratorium and the enrollment condition, that treat Hasidic Jewish religious assemblies and institutions on less than equal terms than non-Hasidic Jewish assemblies and institutions.

328. Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' violation of their constitutional rights.

329. Defendants have caused Plaintiffs to suffer, and to continue to suffer, irreparable harm, damage, and injury. Plaintiffs will continue to suffer damages unless Defendants' acts and conduct complained of are permanently enjoined.

## AS AND FOR A THIRD CAUSE OF ACTION
### "Nondiscrimination"
### Religious Land Use and Institutionalized Persons Act of 2000
### 42 U.S.C. § 2000cc-2(b)(2)

330. Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

331. Hasidic Jewish religion and culture require religious single sex schools for the education of Hasidic Jewish children.

332. The development, operation, and expansion of the private religious school constitutes protected religious exercise within the meaning of RLUIPA.

333. The use of the Property located at 212/236 Cherry Lane for a private religious school is a permitted use within the zone in which the property is located and no use variance is required.

334. Indeed, the Property served as a private religious school and day camp with more than 400 students enrolled for 15 years before Central UTA acquired the Property.

335.    At no time prior to Central UTA's purchase of the Property and operation of a Hasidic Jewish religious school did the Village enforce any condition on the total enrollment of Ateres' religious school.

336.    Ateres was permitted to renovate numerous buildings on the Property to serve its growing student population, while the Village has unduly enforced the moratorium, the illegal total student enrollment condition, and other local laws to restrict Central UTA's development of adequate school facilities.

337.    The only difference between Ateres' religious school and Central UTA's is that Central UTA educates Hasidic Jewish children, whereas Ateres educated non-Hasidic Jewish children.

338.    Furthermore, the Cherry Lane Elementary School, which is one of Suffern Central's primary schools, is located across the street on the same road as Central UTA's Property and has enrolled more than 300 students on a 5.66-acre property, upon information and belief, without the Village imposing any restriction on the total number of students it may enroll.

339.    In fact, the Cherry Lane Elementary School has averaged more than 430 students enrolled per year since the 1998-99 school year.

340.    Central UTA's Property is almost four times the size of Cherry Lane's, yet the Village has attempted to prohibit Central UTA from educating more than 167 Hasidic Jewish students at its private religious school.

341.    The only difference between the Cherry Lane Elementary School and Central UTA's is that Central UTA is a private religious school that educates Hasidic Jewish children, whereas Cherry Lane is a public school that educates secular students.

342.   There is no compelling governmental interest justifying the enforcement of an enrollment restriction on Central UTA's private religious school.

343.   From the Village's inception, Defendants have made countless and continuous efforts to frustrated and prevent the development of Hasidic Jewish-owned properties.

344.   Defendants have deprived and continue to deprive Plaintiffs, including religious assemblies and institutions, of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations, including the building moratorium, that discriminate against the Plaintiffs on the basis of religion.

345.   Jewish-owned properties in Airmont face unwavering discrimination against them by Airmont public officials including Defendants.

346.   The Village Defendants have stonewalled and constructively denied Central UTA's site plan application for development of the private religious school for no reason other than religious discrimination.  The Village Defendants have deliberately avoided making a final decision on the site plan application and by so doing, have constructively denied it.

347.   Central UTA's application has become futile as a matter of law, because it is inevitable that the Village CDRC and Planning Board will refuse the application, taking into consideration the record of the Town Defendants' hostility, delay, and obstruction.

348.   The Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' violation of their constitutional rights.

349.   Defendants have caused the Plaintiffs to suffer, and to continue to suffer, irreparable harm, damage and injury.  The Plaintiffs will continue to suffer damages unless the Defendants' acts and conduct complained of are permanently enjoined.

## AS AND FOR A FOURTH CAUSE OF ACTION
### "Exclusions and Limits"
### Religious Land Use and Institutionalized Persons Act of 2000
### 42 U.S.C. § 2000cc-2(b)(3)(A)

350.    Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

351.    Hasidic Jewish religion and culture require religious single sex schools for the education of Hasidic Jewish children.

352.    The development, operation, and expansion of the private religious school constitutes protected religious exercise within the meaning of RLUIPA.

353.    The use of the Property located at 212/236 Cherry Lane for a private religious school is a permitted use within the zone in which the property is located and no use variance is required.

354.    Indeed, the Property served as a private religious school and day camp with more than 400 students enrolled for 15 years before Central UTA acquired the Property.

355.    At no time prior to Central UTA's purchase of the Property and operation of a Hasidic Jewish religious school did the Village enforce any condition on the total enrollment of Ateres' religious school.

356.    Ateres was permitted to renovate numerous buildings on the Property to serve its growing student population, while the Village has unduly enforced the moratorium, the illegal total student enrollment condition, and other local laws to restrict Central UTA's development of adequate school facilities.

357.    The only difference between Ateres' religious school and Central UTA's is that Central UTA educates Hasidic Jewish children, whereas Ateres educated non-Hasidic Jewish children.

58

358.    Furthermore, the Cherry Lane Elementary School, which is one of Suffern Central's primary schools, is located across the street on the same road as Central UTA's Property and has enrolled more than 300 students on a 5.66-acre property, upon information and belief, without the Village imposing any restriction on the total number of students it may enroll.

359.    In fact, the Cherry Lane Elementary School has averaged more than 430 students enrolled per year since the 1998-1999 school year.

360.    Central UTA's Property is almost four times the size of Cherry Lane's, yet the Village has attempted to prohibit Central UTA from educating more than 167 Hasidic Jewish students at its private religious school.

361.    The only difference between the Cherry Lane Elementary School and Central UTA's is that Central UTA is a private religious school that educates Hasidic Jewish children, whereas Cherry Lane is a public school that educates secular students.

362.    There is no compelling governmental interest justifying the enforcement of an enrollment restriction on Central UTA's private religious school.

363.    From the Village's inception, Defendants have made countless and continuous efforts to frustrate and prevent the development of Hasidic Jewish-owned properties.

364.    The sole purpose of the Defendants' actions was to stop the expansion and operation of Central UTA's Hasidic Jewish religious school.

365.    In furtherance of the scheme to oppose development and operation of Central UTA's Hasidic Jewish school, Defendants voted to enact Local Law No. 1, which forced Central UTA to continue to operate its girls school and boys school in inadequate school facilities and prevented Central UTA from enrolling additional students.

366.    Defendants also interminably delayed and, in effect, constructively denied Central UTA's site plan application for expansion of the private religious school.

367.    Defendants also deprived or conspired to deprive Plaintiffs of the transportation and special needs services owed to them because they are either residents within Suffern Central or Suffern Central is the district of school location.

368.    The refusal to issue a building permit, an operating permit, the continued denial of site plan approval, the decision by the Zoning Board of Appeals, and the continued denial of transportation and special needs services for the private religious school prohibits the development and operation of religious schools necessary to the practice of Hasidic Judaism in the Village of Airmont.

369.    The Village Defendants have deliberately avoided making a final decision on Central UTA's site plan application and by so doing, have constructively denied it.  Central UTA's application has become futile as a matter of law, because it is inevitable that the Village Planning Board will refuse the application, taking into consideration the record of the Defendants' hostility, delay, and obstruction.

370.    Defendants, therefore, have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing a land use regulation that wholly excludes the Plaintiffs' use from its jurisdiction on the basis of religion.

371.    The Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' violation of their constitutional rights.

372.    Defendants have caused the Plaintiffs to suffer, and to continue to suffer, irreparable harm, damage and injury. The Plaintiffs will continue to suffer damages unless the Defendants' acts and conduct complained of are permanently enjoined.

## AS AND FOR A FIFTH CAUSE OF ACTION
### U.S. Constitution, First and Fourteenth Amendments
### 42 U.S.C. § 1983

373.    Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

374.    Defendants' laws and actions deprived and continue to deprive the Plaintiffs of their right to free exercise of religion by substantially burdening the Plaintiffs' religious exercise without a compelling government interest.

375.    Defendants' laws and actions deprived and continue to deprive the Plaintiffs of their right to free exercise of religion by discriminating against and targeting the Plaintiffs solely due to their religious nature.

376.    The Village of Airmont, its Board of Trustees, its Zoning Board of Appeals, and its Building Department have a custom and practice of imposing requirements to substantially delay or prevent the religious exercise of members of the Hasidic Jewish community.

377.    Suffern Central has a custom and practice of delaying and denying Hasidic Jewish students transportation and education services on the basis of religion.

378.    Defendants' laws and actions are hostile towards the Hasidic Jewish community and effectively impose a penalty on the free exercise of religion in the Village by regulating or outlawing conduct because it is religiously motivated.

379.    Defendants' laws and actions deprived and continue to deprive the Plaintiffs of their right to free exercise of religion by effectively prohibiting the Plaintiffs from living within

the Village's jurisdiction by denying them the ability to educate their children as their religion requires.

380.    Defendants' laws and actions deprived and continue to deprive the Plaintiffs of their right to free exercise of religion by treating religious assemblies and institutions on less equal terms as nonreligious assemblies and institutions.

381.    The Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' violation of their constitutional rights.

382.    Defendants have caused the Plaintiffs to suffer, and to continue to suffer, irreparable harm, damage and injury.  The Plaintiffs will continue to suffer such damages unless the Defendants' acts and conduct complained of are permanently enjoined.

## AS AND FOR A SIXTH CAUSE OF ACTION
### U.S. Constitution, First and Fourteenth Amendments
### 42 U.S.C. § 1983

383.    Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

384.    Defendants' laws and actions deprived and continue to deprive the Plaintiffs of their right to freedom of intimate association and freedom of expressive association, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment, by intruding upon the Plaintiffs' right to the raising and education of children and by intruding upon the Plaintiffs' right to associate for purposes of protected expressive activity.

385.    Defendants have taken every action they can think of, including the enactment of laws and issuance of notices of violation, to prevent Plaintiffs from practicing their religion.

386.    The Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' violation of their constitutional rights.

387.    Defendants have caused the Plaintiffs to suffer, and to continue to suffer, irreparable harm, damage and injury.  The Plaintiffs will continue to suffer such damages unless the Defendants' acts and conduct complained of are permanently enjoined.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**U.S. Constitution, Fourteenth Amendment**
**42 U.S.C. § 1983**

388.    Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

389.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides, in pertinent part, that no state shall "deprive any person of life, liberty or property, without due process of law."

390.    Defendants' laws and policies gave Defendants unfettered discretion to grant or deny building permit applications.

391.    The Village Defendants arbitrarily enacted the building moratorium and continue to arbitrarily apply existing ordinances against the Plaintiffs.

392.    The Village Defendants' actions are designed to prevent the expansion of Central UTA's religious school for children of the Jewish faith, and prevent the Hasidic Jewish community from freely practicing their religion.

393.    The Village lacked authority to impose a moratorium interfering with the beneficial enjoyment of property rights pursuant to its police powers unless it demonstrates that it has acted in response to a dire necessity, that its action is reasonably calculated to alleviate or prevent the crisis condition, and that it is presently taking steps to rectify the problem.

394.    Village Local Law No. 1 was not enacted in response to a dire necessity or crisis condition.

395.    The Village also lacked authority to impose a moratorium interfering with the beneficial enjoyment of property rights pursuant to its zoning powers unless it demonstrated that the moratorium has a valid rational basis and is reasonably limited in duration.

396.    The Village's asserted public purposes for the building permit moratorium: to "1. preserve the suburban and remaining semi-rural character of the Village. 2. Develop zoning and building regulations that reduce or restrict odors, sounds, commercial traffic, light pollution and other negative environmental impacts on residential areas. 3. Expand initiatives to safeguard neighborhoods from inappropriately scaled development" and undertaking a comprehensive review of the Village's zoning code, did not provide a valid or rational basis to preclude all construction in the Village.

397.    Thus, the building permit moratorium imposed by Village Local Law No. 1 was not reasonably limited in duration.

398.    No substantial risk to the health, safety, or welfare of the residents of the Village existed to support the adoption of the building permit moratorium in Village Local Law No. 1.

399.    The Village Defendants' enactment and enforcement of the building moratorium caused Plaintiffs damages as a result of the delay in being able to renovate and improve the inadequate facilities of Central UTA's boys school and girls school.

400.    Accordingly, Plaintiffs are entitled to an award of compensatory damages in an amount to be determined at trial against Defendants Village of Airmont and its named boards and departments, but none of the individual defendants, for the harm and damage caused by Defendants' violation of Plaintiffs' constitutional rights.

## AS AND FOR AN EIGTH CAUSE OF ACTION
### U.S. Constitution, Fourteenth Amendment
### 42 U.S.C. § 1983

401.   Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

402.   The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o state shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws."

403.   Camp Regesh ran a 600-student day camp from 1996 through 2016 on the Property.

404.   Ateres likewise ran a private school for girls that enrolled up to 415 students per year from 2001 through 2016 on the Property.

405.   Central UTA purchased the Property in 2016 and opened a private religious school and enrolled between 200-300 students.

406.   After Central UTA advised the Village that it intended to apply for site plan approval to build two new school buildings that could accommodate the growth of its student population well into the future, Defendants responded with a discriminatory campaign targeted at precluding or frustrating Central UTA's use and expansion of the Property.

407.   Defendants have created and attempted to enforce a plainly illegal maximum student enrollment restriction on Central UTA's use of the Property as a school, precluding the receipt of needed and mandatory services from Suffern Central.

408.   The Notice of Violation and the Village ZBA's affirmance thereof is solely intended to deny Central UTA the same rights to use its property that are granted to every other property owner in the Village, including to Ateres's non-Hasidic Jewish religious school that

previously operated on the Property and to Suffern Central's Cherry Lane Elementary School that currently operates on property across the street from Central UTA.

409.    The Village ZBA is not permitted to impose or enforce conditions on use or occupancy of a building if such a condition is not provided for in the Village Zoning Code.

410.    Despite being on notice that the prior owner intended to, and did, use the school as a private religious school enrolling over 400 students, Defendants made no attempt to enforce the purported maximum student enrollment restriction on the Ateres school until after Central UTA purchased the Property, began to educate Hasidic Jewish children, and advised the Village of its intention to build two new school buildings on the Property.

411.    Upon information and belief, no total student enrollment limitation is enforced against Suffern Central's Cherry Lane Elementary School, which has more than 300 enrolled students on a 5.66-acre property across the street from Central UTA's 21-acre Property.

412.    In fact, the Cherry Lane Elementary School has averaged more than 430 students enrolled per year since the 1998-99 school year.

413.    With the enactment of Village Local Law No. 1, the Village Defendants sought to prevent any development or maintenance of the Property, and to prevent Central UTA from having adequate school facilities in which to educate Hasidic Jewish students.

414.    Village officials have similarly ignored other applications made by members of the Hasidic community applied for *prior to* the enactment of the building moratorium.

415.    Defendants' laws and actions deprived and continue to deprive Plaintiffs of their right to equal protection of the laws.

416.    The Defendants have acted with discriminatory animus against Plaintiffs.

417.    The Village Defendants have deliberately failed to review Central UTA's application, rendering the application futile as a matter of law. It is inevitable that the Village CDRC and Planning Board will refuse the application, taking into consideration the record of the Village Defendants' hostility, delay, and obstruction.

418.    Defendants' laws and actions deprived and continue to deprive Plaintiffs of their right to equal protection of the laws with respect to the Property, as secured by the Fourteenth Amendment, by (1) discriminating against and targeting Plaintiffs for disfavor; (2) by treating Hasidic religious institutions on less than equal terms as similarly situated nonreligious institutions; and (3) by enforcing land use regulations which constitute a grave interference with fundamental rights.

419.    Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' violation of their constitutional rights.

420.    Defendants have caused the Plaintiffs to suffer, and to continue to suffer, irreparable harm, damage and injury.  The Plaintiffs will continue to suffer such damages unless the Village's acts and conduct complained of are permanently enjoined.

### AS AND FOR A NINTH CAUSE OF ACTION
### U.S. Constitution, Fourteenth Amendment
### 42 U.S.C. § 1983

421.    Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

422.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o state shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws."

423.    Defendants' laws and actions deprived and continue to deprive Plaintiffs of their right to equal protection of the laws with respect to the actions taken in the community against members of the Jewish religion, including the refusal to review or grant requested approvals for Central UTA's religious school.

424.    Development of the private religious school is necessary to allow the individual Plaintiffs and all other Hasidic Jewish residents of Airmont to exercise their religion in the Village.

425.    The Village Planning Board continues to delay consideration of Central UTA's application to build two new school buildings.

426.    The CDRC also continuously fabricates reasons to prevent the approval of the religious school proposal, including that Central UTA is allegedly in violation of the illegal total student enrollment condition.

427.    The CDRC has not addressed any of the permissible considerations of site plan review and, therefore, has precluded Central UTA from proceeding with its application before the Planning Board.

428.    As a result, the Village has constructively denied Central UTA's application to build the two new school buildings.

429.    These actions, therefore, have infringed upon the rights secured by the Fourteenth Amendment, by (1) discriminating against and targeting the Plaintiffs for disfavor; (2) by treating religious institutions on less than equal terms as similarly situated nonreligious institutions; and (3) by enforcing land use regulations which constitute a grave interference with fundamental rights.

430.   The Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' violation of their constitutional rights.

431.   Defendants have caused the Plaintiffs to suffer, and to continue to suffer, irreparable harm, damage and injury.  The Plaintiffs will continue to suffer such damages unless the Village's acts and conduct complained of are permanently enjoined.

**AS AND FOR A TENTH CAUSE OF ACTION**
**U.S. Constitution, Fourteenth Amendment**
**42 U.S.C. § 1985(3)**

432.   Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

433.   By way of their conduct as set forth in this Complaint, and acting under color of state law, the Defendants have conspired, and continue to conspire, to deprive Plaintiffs, and others similarly situated, of the equal protection of the laws, as guaranteed by the Fourteenth Amendment to the United States Constitution, on the basis of their religious beliefs and practices.

434.   Defendants' have conspired to use their laws and actions to deprive Plaintiffs of equal protection of the law and have taken actions in the community against members of the Jewish religion, including the enforcement of illegal conditions on the total enrollment of Central UTA's religious school, deprivation of the rights of Central UTA's students to transportation and special education services from Suffern Central, and the Village's attempt to cause the revocation of Central UTA's real property tax exemption.

435.   Together, Defendants, by their actions, seek to disenfranchise Hasidic Jewish-owned properties while at the same time ignoring regulation violations and complaints against non-Hasidic Jewish owned properties.

436.   Defendants, as officers of the municipalities plainly act against Hasidic Jewish-owned properties as a result of their positions within the community.

437.   Defendants have caused the Plaintiffs to suffer, and to continue to suffer, irreparable harm, damage and injury.  The Plaintiffs will continue to suffer such damages unless the Village's acts and conduct complained of are permanently enjoined.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### New York State Constitution
### Article I §§ 3, 6, 11

438.   Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

439.   All of the Defendants, by their acts, have acted under color of law and have conspired and continue to conspire, in breach of Plaintiffs' rights to protect their interests under the law in violation of Article I, § 3 (freedom of association, exercise), Article I, § 6 (due process), Article I, § 9, and Article I, § 11 (equal protection; discrimination in civil rights) of the New York State Constitution.

440.   Thus, the Village's improper use of its land use regulations, refusal to review Central UTA's site plan application and issue a building permit to Central UTA for the renovation of existing buildings for its private religious school, and the enactment of Village Local Law No. 1 all place a substantial burden on the religious exercise of the individual Plaintiffs in violation of the Article I, § 3 of the New York State Constitution.

441.   The Village Board of Trustees has not identified any compelling governmental interest for the Village Local Law No. 1's effective prohibition on the development of religious schools necessary to the practice of Hasidic Judaism in the Village of Airmont.

442.    The stated purpose alleged by the Village Board for the building moratorium – an investigation into New York State Building Code compliance and a comprehensive review of the land use regulations due to a desire to preserve the character of the Village and prevent inappropriately scaled development – is merely a pretext for discrimination against the Village's Hasidic Jewish population.

443.    Article I, § 6 of the New York State Constitution similarly provides, in pertinent part, that "[n]o person shall be deprived of life, liberty or property without due process of law."

444.    The Hasidic community has been unceremoniously discriminated against by the continuous refusal to permit Central UTA to enroll more than 167 students, to provide mandated transportation and special needs services to students residing in Suffern Central, and to grant building permits and approvals for the maintenance and expansion of a religious school, which has left Village residents – and potential Village residents – without the ability to provide the schooling required under the law.

445.    Article I, § 11 of the New York State Constitution similarly provides that "[n]o person shall be denied the equal protection of the laws of this state or any subdivision thereof."

446.    Actions taken by community members, Village residents, and elected officials have sought to restrict Jewish entry into the community.  Hasidic Jewish-owned properties receive disproportionate amounts of attention from Village officials and are scrutinized more so than properties not owned by members of the Hasidic community in the Village.

447.    As a result of Defendants' actions, Plaintiffs have suffered, and continue to suffer irreparable harm, damage and injury, and the plaintiffs will continue to suffer such harm unless the Defendants' acts and conduct complained of are permanently enjoined.

## AS AND FOR A TWELFTH CAUSE OF ACTION
### Moratorium is Arbitrary and
### Capricious under New York State Law

448.    Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

449.    Village Local Law No. 1 was voted on and enacted by Defendant Village Board of Trustees, which is comprised of Defendants Gigante, Marchesani, Valvo, Blunnie, and Warbrick.

450.    Village Local Law No. 1 established a moratorium suspending the receipt, consideration, or issuance of *all* development approvals in residential zones in the Village, essentially foreclosing all construction and repair in residential zones of the Village, including of Central UTA's religious school.

451.    By its terms, the moratorium was to last for a period of 6 months, with the possibility of one six-month extension. The moratorium was extended numerous times and remained in effect until September 4, 2018, a period of more than 18 months.

452.    As Village Clerk, Defendant Lisa-Ann DiMarsico-Smith worked with Defendant Mayor Gigante and the Village Code Enforcement Officers, including Marino Fontana, to enforce the moratorium on a daily basis.  At all times, DiMarsico-Smith, Mayor Gigante, and all Code Enforcement Officers were acting pursuant to the custom and practice of the Village and its Building Department to delay, harass, and prevent Hasidic Jewish residents from legal property expansion.

453.    The Village lacked authority to impose a moratorium interfering with the beneficial enjoyment of property rights pursuant to its police powers.

72

454. Village Local Law No. 1 of 2016 was not enacted in response to a dire necessity or crisis condition.

455. No substantial risk to the health, safety, or welfare of the residents of the Village exists to support the adoption of the building permit moratorium in Village Local Law No. 1.

456. The Village Defendants unreasonably delayed action regarding the alleged comprehensive review of the Village's zoning code, and failed to show any evidence of a substantial risk to the health, safety, or welfare of the residents that existed before *or* after the moratorium so as to justify its enactment.

457. The Village Defendants' enactment and enforcement of the building moratorium was arbitrary and capricious, and caused Plaintiffs damages as a result of the delay in being able to renovate and improve the inadequate facilities of Central UTA's boys school and girls school.

458. Accordingly, Plaintiffs are entitled to an award of compensatory damages in an amount to be determined at trial against Defendants Village of Airmont and its named boards and departments and Suffern Central, but none of the individual defendants, for the harm and damage caused by Defendants' violation of Plaintiffs' constitutional rights.

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

(1) Enjoining Defendants, their officers, agents, employees, and attorneys from enforcing or endeavoring to prohibit Plaintiffs from using their Property in the Village of Airmont;

(2) Enjoining Defendants from further preventing the lawful land use of the private religious school;

(3)     Enjoining Defendants Suffern Central and Douglas S. Adams from interfering with the rights of Central UTA students to receive transportation and special education services to which they are entitled under the law;

(4)     Awarding Plaintiffs compensatory damages against Defendants Village of Airmont and its named boards and departments and Suffern Central but none of the individual defendants, in favor of Plaintiffs as the Court deems just for the loss of Plaintiffs' free exercise of religion, freedom of association, deprivation of Plaintiffs' right to equal protection and due process under the laws, and expenses incurred by Plaintiffs and caused by Defendants' actions in an amount to be determined at trial, but in no event less than $25,000,000.00;

(5)     Awarding Plaintiffs the costs, disbursements, and attorneys' fees incurred in connection with this action pursuant to 42 U.S.C. § 1988 against Defendants Village of Airmont and its named boards and departments and Suffern Central but none of the individual defendants; and

(6)     Awarding Plaintiffs such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Pursuant to Fed. R. Civ. Pro. 38, Plaintiffs demands a jury on all issues so triable.

Dated: November 28, 2018
      Albany, New York

WHITEMAN OSTERMAN & HANNA LLP

By:    */s/ John J. Henry*
      John J. Henry, Esq. (JH 7137)
      Robert S. Rosborough IV, Esq. (RR 5604)
      Christine M. Carletta, Esq. (CC 0864)
      One Commerce Plaza
      Albany, New York 12260
      (518) 487-7600
      (518) 487-7777 (facsimile)
      jhenry@woh.com
      rrosborough@woh.com
      ccarletta@woh.com

      FIRST LIBERTY INSTITUTE
      Hiram Sasser, Esq.
      Keisha Russell, Esq.
      2001 W Plano Pkwy
      Suite 1600
      Plano, Texas 75075

      *Attorneys for Plaintiffs*

4825-2488-5361