UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
CENTRAL UTA OF MONSEY;                       :
CONGREGATION YETEV LEV OF              :
MONSEY; CHESKEL AND LEA                    :
WERZBERGER, individually and on behalf of  :
their minor children, B.W., G.W., and C.W.;   :
MORDECHI AND RACHEL EGER,             :
individually and on behalf of their minor       :
children, B.E. and G.E.; ALEXANDER AND  :
SARA SICHERMAN, individually and on behalf :
of their minor child, R.S.; CHAIM AND        :
CHAYA WERCBERGER, individually and on   :
behalf of their minor child, R.W.; RUBEN AND :
BAILA WERCZBERGER, individually and on  :
behalf of their minor child, B.W.; JOEL AND  :
RIVKY GROSS, individually and on behalf of  :
their minor children, M.G. and W.L.; JOEL AND :
ESTY WERZBERGER, individually and on      :
behalf of their minor child, T.W.; HERSHEL   :
AND MALKA LANDAU, individually and on    :
behalf of their minor child R.L.; YITZCHOCK  :
LEBOVITS; YOSEF GRUBER; GITTY         :          **OPINION AND ORDER**
KASIRER; YITZHOK SCHIFF; ARON         :
GLAUBER; and RIFKI GLAUBER,             :          18 CV 11103 (VB)
                          Plaintiffs,            :
                                                 :
v.                                               :
                                                 :
VILLAGE OF AIRMONT, NEW YORK;         :
PHILIP GIGANTE, individually and as Mayor of :
the Village of Airmont; SEAN MACK,           :
individually and as Village Attorney; DANIEL  :
KRAUSHAAR, individually and as Deputy       :
Village Attorney; LISA-ANN DIMARSICO-     :
SMITH, individually and as Village Clerk and   :
Treasurer of the Village of Airmont; VILLAGE  :
OF AIRMONT BOARD OF TRUSTEES; PAUL :
MARCHESANI, ANTHONY VALVO, PETER   :
BLUNNIE, and KEVIN WARBRICK,           :
individually and as members of the Village of   :
Airmont Board of Trustees; VILLAGE OF      :
AIRMONT ZONING BOARD OF APPEALS;   :
CHARLES PICARELLI, LAURIE              :
DIFRANCESCO, SCOTT MEIER, and LINDA  :

1

CARBONE, individually and as members of the :
Village of Airmont Zoning Board of Appeals; :
VILLAGE OF AIRMONT PLANNING :
BOARD; JOHN CORNELIUS, DOUGLAS :
WHIPPLE, ANTHONY SANTUCCI, :
WILLIAM PHILIP, RUSSELL HOCK, PAVLE :
LECEI, KEN BREZNER, and SUZANNE :
CARLEY, individually and as members of the :
Village of Airmont Planning Board; BUILDING :
DEPARTMENT OF THE VILLAGE OF :
AIRMONT; LOUIS ZUMMO, individually and :
as Building Inspector for the Village of Airmont; :
MARINO FONTANA, individually and as Code :
Enforcer of the Village of Airmont; and :
SUFFERN CENTRAL SCHOOL DISTRICT, :
                    Defendants. :
--------------------------------------------------------------x

Briccetti, J.:

       This dispute arises from allegations that Central UTA of Monsey ("CUTA") desires to

expand its Hasidic Jewish school in the Village of Airmont, New York (the "Village"), the

Village is preventing it from doing so, and the Suffern Central School District (the "District") is

refusing to provide transportation and special needs services to CUTA in the interim.

       Plaintiffs are (i) CUTA; (ii) Congregation Yetev Lev of Monsey, which allegedly

purchased property in reliance on CUTA being able to provide educational services; (iii) seven

sets of parents, individually and on behalf of their minor children, who are unable to send their

children to CUTA's schools or who allegedly have been unlawfully denied transportation to

CUTA's schools; (iv) the parents of one student, individually and on behalf of their minor child,

whom the District allegedly denied special needs services; and (v) six individuals who allegedly

desire to move to the Village, but are unable to do so because of defendants' actions allegedly

preventing their children from attending CUTA's schools.

       The "Village Defendants" are (i) the Village; (ii) the Village Board of Trustees; (iii) the

Village Zoning Board of Appeals (the "ZBA"); (iv) the Village Planning Board; (v) the Village

Building Department; and (vi) twenty-two Village officials, in their individual and official capacities, including the mayor, clerk and treasurer, attorney, deputy attorney, building inspector, code enforcer, and members of the Board of Trustees, ZBA, and Planning Board.[1]

Plaintiffs also bring claims against the District.

Plaintiffs assert the following claims:

- First, CUTA brings (i) substantial burden (Claim 1), (ii) equal terms (Claim 2), (iii) nondiscrimination (Claim 3), and (iv) exclusions and limits (Claim 4) claims under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, et seq., against the Village, ZBA, Board of Trustees, Building Department, and Planning Board;

- Second, all plaintiffs bring claims against all defendants under 42 U.S.C. § 1985(3) for conspiracy to violate their right to equal protection (Claim 10), and under 42 U.S.C. § 1983 for violation of their First and Fourteenth Amendment rights to (i) free exercise of religion (Claim 5), (ii) freedoms of intimate and expressive association (Claim 6), and (iii) equal protection (Claims 8 and 9);

- Third, all plaintiffs bring a Section 1983 claim against the Village Defendants for violation of their right to due process (Claim 7); and

- Fourth, all plaintiffs bring state law claims against all defendants for violation of their rights under the New York State Constitution to freedom of association, exercise of religion, due process, equal protection, and for discrimination in civil rights and conspiracy to violate those rights (Claim 11).

Now pending are the following motions:

- The Village Defendants' motion to dismiss the amended complaint pursuant to Rules 12(b)(1) and 12(b)(6) (Doc. #115);

- The District's motion to dismiss the amended complaint pursuant to Rule 12(b)(6) (Doc. #118); and

---

[1] For ease of reference, the Court refers generally to the Village Defendants throughout this Opinion and Order. However, the Court addresses infra whether plaintiffs have sufficiently alleged the personal involvement of the individual Village Defendants. In addition, plaintiffs assert a claim against Suzanne Carley, the clerk of the Planning Board, but plaintiffs failed to include her in the caption of the amended complaint. To avoid confusion, the Court includes her in the above caption.

- Plaintiffs' motion for a preliminary injunction (Doc. #132).[2]

For the following reasons, (i) the Village Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART; (ii) the District's motion to dismiss is DENIED; and (iii) plaintiffs' motion for a preliminary injunction is DENIED.[3]

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## BACKGROUND

For the purpose of ruling on the motions to dismiss, the Court accepts as true all well-pleaded factual allegations in the amended complaint and draws all reasonable inferences in plaintiffs' favor. However, to the extent there are disputed factual issues concerning the Court's jurisdiction, the Court refers to evidence outside the pleadings.[4]

---

[2] On or about October 17, 2019, plaintiffs moved by order to show cause for a preliminary injunction. The Court declined to issue the proposed temporary restraining order, by which plaintiffs requested the Court order the District to provide transportation services to CUTA's eligible students pending determination of plaintiffs' motion for a preliminary injunction. (Doc. #138). Moreover, the Court deferred ruling and ordered briefing on the motion for a preliminary injunction. (Id.). The Court also declined to schedule an evidentiary hearing on the motion, and now finds an evidentiary hearing is unnecessary to resolve the motion because the relevant facts are not in dispute. See Charette v. Town of Oyster Bay, 159 F.3d 749, 755 (2d Cir. 1998) ("An evidentiary hearing [on a motion for a preliminary injunction] is not required when the relevant facts either are not in dispute or have been clearly demonstrated at prior stages of the case, . . . or when the disputed facts are amenable to complete resolution on a paper record.").

[3] Plaintiffs also move to amend the caption because they misspelled several names in the original caption. That motion is unopposed. Thus, those changes are reflected in the above caption, and the Court will direct the Clerk to adjust the names on the docket.

[4] The Court recounts any additional facts asserted in support of and opposition to plaintiffs' motion for a preliminary injunction against the District infra, when the Court addresses the preliminary injunction motion.

I.    <u>The Property</u>

On August 26, 2016, CUTA purchased property at 212/236 Cherry Lane in the Village and District, on the same street as the Village Hall.  CUTA operates a private religious school for the education of Hasidic Jewish children.

The property was formerly known as Camp Regesh, a 600-student summer camp founded in 1996.  From 2001 to 2016, a non-Hasidic Jewish school named Ateres Bais Yaakov Academy ("Ateres") rented Camp Regesh during the school year to operate a private Jewish school for girls.

Before opening the school in 2001, Camp Regesh and Ateres applied to the Village Planning Board for an amended site plan approval to use the property as a private school and to add two buildings.  The Village Planning Board approved the request.

The amended site plan states:  "The maximum number of students to be enrolled at any given time should not exceed 167 students."  (Doc. #108 ("Am. Compl.") ¶ 98).  Nonetheless, at times Ateres enrolled as many as 400 students, a fact that was acknowledged by the Village's Community Design Review Committee ("CDRC").  The Village's building inspector, however, did not require amendment to the site plan, and the Village's fire inspector did not document any fire or safety violations.

II.   <u>Application for Amendment to the Site Plan</u>

When CUTA purchased the Cherry Lane property in August 2016, it began to prepare an application to amend the property's site plan to allow for the construction of two new schools, one for boys and one for girls, consistent with Hasidic Jewish religious practice and custom.

A.     CDRC Application

CUTA submitted an informal application to the CDRC on November 24, 2016.  The CDRC convened on December 12, 2016, and reserved decision on CUTA's application.

In January 2017, the Village's planning and zoning clerk advised CUTA that, for its CDRC application to proceed, CUTA would have to obtain an operating permit from defendant Building Inspector Louis Zummo.  Although CUTA believed an operating permit was not required, it applied to the building department clerk for one on March 9, 2017.  The building department clerk subsequently resigned and CUTA's application was never processed.

Plaintiffs allege that around this time, Zummo erroneously claimed CUTA had never applied for an operating permit.  After CUTA provided the Village with records showing it had, in fact, applied for the permit, Zummo inspected the property and issued no violations.  However, Zummo informed CUTA that Village Attorney Sean Mack had advised him not to issue the operating permit "because it would eliminate the Planning Board's ability to restrict enrollment to 167 students."  (Am. Compl. ¶ 203).

The CDRC reconvened on May 9, 2017.  At that meeting, Zummo noted the property's 2001 site plan permitted only 167 students to be enrolled at the school.  Nonetheless, Zummo and the fire inspector both indicated to the CDRC that the property and facilities were safe.

As of the filing of the amended complaint, the CDRC has not made any recommendations on the project or referred it back to the Planning Board for review.

B.     Planning Board Application

On December 22, 2016, CUTA submitted an informal application to the Planning Board, even though plaintiffs also anticipated the CDRC would refer its application to the Planning Board, pursuant to CUTA's interpretation of the Village Code.  The Planning Board was

scheduled to meet on January 26, 2017, but the meeting was postponed three times, eventually to March 16, 2017. Plaintiffs' amended complaint implies the meeting was adjourned because there was insufficient space to host the meeting due to intense opposition to CUTA's application. However, according to the amended complaint, the Planning Board had plenty of notice that a larger space would be needed.

At the March 16, 2017, meeting, the Planning Board adjourned consideration of CUTA's application because the Village had not retained a traffic consultant to review it or received any substantive comments on it.

The Planning Board then convened on May 25, 2017, to hear CUTA's presentation on the project. The Planning Board did not comment on the presentation and advised CUTA it still had not retained a traffic consultant to review CUTA's application.

In addition, plaintiffs allege the District had sent a letter to the Planning Board opposing CUTA's project because, if approved, CUTA's students would be entitled to receive textbooks and transportation services, which would cost the District money. The District also allegedly stated it believed CUTA's property was not well-suited for CUTA's school.

According to plaintiffs, as of the date of the amended complaint, the Planning Board continued to stall CUTA's application.

III.     Moratorium

On February 8, 2017, the Board of Trustees passed an interim land use development moratorium, which the State of New York accepted on March 8, 2017. The law "established a Village-wide moratorium suspending the receipt, consideration, or issuance of <u>all</u> residential and non-residential subdivisions and other development in all zoning districts 'while the Village considers potential changes to its comprehensive plan and considers and adopts changes to its

land use regulations.'" (Am. Compl. ¶ 154). The moratorium exempted completed applications containing all required submissions to the CDRC.

The moratorium was to last six months, with the possibility of one extension by the Village Board of Trustees for good cause. But the Board of Trustees extended the moratorium three times, such that the moratorium remained in place eighteen months after its enactment. The moratorium expired on or about September 4, 2018.

IV.    Renovations

At some point that is unclear from the amended complaint, CUTA applied to renovate an existing building on its property, which Zummo had determined needed improvements before it could be occupied for school use. However, Zummo allegedly orally denied CUTA's permit application because CUTA was educating 200 to 300 students at the school, purportedly in violation of the 167-student enrollment condition specified in the property's 2001 site plan approval.

V.    Notice of Violation

On August 5, 2017, defendant Code Enforcer Marino Fontana issued a Notice of Violation ("NOV") to CUTA. The NOV allegedly states: "The owner/representative admitted at a May 9, 2017 [CDRC] meeting to operating a school for 200 to 300 students. 236 Cherry Lane does not have a Certificate of Occupancy to operate a school for 200 to 300 students." (Am. Compl. ¶ 227). CUTA timely appealed the Notice of Violation to the ZBA.

The ZBA met on January 11 and March 8, 2018, to discuss the NOV. On May 16, 2018, the ZBA announced its decision to affirm the NOV, and on July 12, 2018, it issued a supporting written decision.

On June 15, 2018—after the ZBA announced its decision affirming the NOV but before it issued its written decision—CUTA commenced an Article 78 proceeding in Supreme Court, Rockland County, seeking to annul the ZBA's decision and bringing a claim for violation of CUTA's right to equal protection. On March 12, 2019, the state court upheld the ZBA's decision to issue the NOV "on the ground that [CUTA] did not have a CO to operate a school for 200-300 students" as "not illegal, arbitrary, capricious, or an abuse of discretion." Cent. UTA of Monsey v. Village of Airmont et al., No. 033675/2018, at 15 (Sup. Ct. Rockland Cty. Mar. 12, 2019), NYSCEF #89. The court also upheld the ZBA's decision to affirm the violation. Id. However, the court allowed CUTA's equal protection claim to proceed. Id. at 18.

On December 18, 2019, the state court defendants moved for summary judgment. Notice of Motion for Summary Judgment, Cent. UTA of Monsey v. Village of Airmont et al., No. 033675/2018 (Sup. Ct. Rockland Cty. Dec. 18, 2019), NYSCEF #124. This motion is currently pending.

According to the instant amended complaint, CUTA "faces over 2 million dollars in fines as a result of the [NOV], has reduced the number of students it may enroll and charge tuition to, lost its construction loan as a result of the Village Defendants' actions, is unable to acquire clear title on the Property in order to refinance the loan, and, consequently, is defaulting on its mortgage." (Am. Compl. ¶ 241).

In addition, plaintiffs allege the Village's Board of Trustees relied on the NOV in a scheme to revoke CUTA's exemption from real property taxes, which the board allegedly discussed at a January 2018 meeting. According to the amended complaint, on March 1, 2018, the Village directed the Town of Ramapo (the "Town") Assessor to revoke CUTA's real property tax exemption because of the alleged zoning law violation. The Town Assessor

allegedly complied. CUTA then grieved its subsequent property tax assessment and argued for restoration of its tax exemption. Thereafter, the Town reversed its decision and restored CUTA's tax exemption.

VI.     The District

Plaintiffs allege that from 2001 to 2016, the District provided transportation and special needs services to Ateres. However, beginning in September 2016, the District refused to provide those services to CUTA. The District claimed CUTA did not have a valid certificate of occupancy showing the property was approved for a school and for educational use.

CUTA initially submitted a 2005 certificate of occupancy to the District. However, according to the amended complaint, the 2005 certificate of occupancy misspelled "school" as "schull" and, as a result, Zummo refused to certify that CUTA complied with the Village's zoning laws and regulations. (Am. Compl. ¶ 264). Thereafter, the District allegedly relied on Zummo's determination and declined to provide the transportation and special needs services.

In November 2016, CUTA resubmitted to the District its fire report, certificate of occupancy, school information request form, and a letter from former Village Building Inspector Ian Smith indicating the facility was approved for a school. The District refused the letter and said it had contacted the Village for additional documentation from Building Inspector Zummo.

Plaintiffs allege CUTA then located another certificate of occupancy, dated October 24, 2001. However, this certificate of occupancy listed the address for the property as 212 Cherry Lane, rather than 236 Cherry Lane. According to CUTA, the property had been issued two different street addresses—212 and 236 Cherry Lane—because the property was large, but the property remained a single integrated tax lot.

CUTA submitted the 2001 certificate of occupancy to Zummo, who rejected it. CUTA also wrote a letter to defendant Deputy Village Attorney Kraushaar explaining the address discrepancy and typographical error, but Kraushaar never responded.

CUTA then sent the 2001 certificate of occupancy and explanation regarding the address discrepancy to the District. The District's Transportation and Purchasing Supervisor responded: "the District 'defer[s] questions regarding Certificate of occupancy and Fire Safety to the local authority' and 'have contacted the Village of Airmont for guidance [sic] and are waiting their response.'" (Am. Compl. ¶ 278 (alterations in original)).

On March 2, 2017, the District rejected the 2001 certificate of occupancy for 212 Cherry Lane, allegedly relying on Zummo's conclusion that the certificate was not valid for 236 Cherry Lane.

Plaintiffs allege in May 2017, CUTA provided the District with a third certificate of occupancy, this one also from 2001. The District confirmed this latest certificate of occupancy was valid, but noted the certificate was for a different building than the building identified in CUTA's prior documentation. Thus, the District requested a current fire safety certificate for the building. Village Fire Inspector Shlomo M. Pomeranz explained to the District that the structure referenced in the third certificate of occupancy was a building that had been re-numbered in 2001, and that Pomeranz had previously issued a fire safety certificate as to that building.

The District again refused to provide the requested services to CUTA, stating CUTA did not have "municipal approvals." (Am. Compl. ¶ 288). And on April 19 and July 16, 2018, the District sent letters to CUTA, stating it did not have current fire inspection reports or valid certificates of occupancy, and requesting a certificate of occupancy for every structure on the property.

Plaintiffs allege that on March 29, 2019, CUTA submitted "a complete request" to register its school with the District, and provided the necessary certificates of occupancy and fire safety certificates. (Am. Compl. ¶ 295). The District's Transportation and Purchasing Supervisor told CUTA she would "reach [out to] the building department in the Village to confirm the status of your Certificate of Occupancy . . . and will let you know if they provide information allowing us to approve your registration." (Id. ¶ 300 (alterations in original)).

Plaintiffs allege the Village did not confirm the validity of the certificates of occupancy, and as of the date of the amended complaint, the District has refused to provide CUTA with the requested services.

**DISCUSSION**[5]

I.     Standard of Review on the Motions to Dismiss

     A.     Rule 12(b)(1)

"[F]ederal courts are courts of limited jurisdiction and lack the power to disregard such limits as have been imposed by the Constitution or Congress." Durant, Nichols, Houston, Hodgson, & Cortese-Costa, P.C. v. Dupont, 565 F.3d 56, 62 (2d Cir. 2009). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Nike, Inc. v. Already, LLC, 663 F.3d 89, 94 (2d Cir. 2011). The party invoking the Court's jurisdiction bears the burden of establishing jurisdiction exists. Conyers v. Rossides, 558 F.3d 137, 143 (2d Cir. 2009). When a defendant moves to dismiss for lack of subject matter jurisdiction and on other grounds, the court should

---

[5]    Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

resolve the Rule 12(b)(1) challenge first.  Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir. 1990).

In deciding a motion to dismiss under Rule 12(b)(1) at the pleading stage, the Court "must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor."  Conyers v. Rossides, 558 F.3d at 143.  But "argumentative inferences favorable to the party asserting jurisdiction should not be drawn."  Buday v. N.Y. Yankees P'ship, 486 F. App'x 894, 895 (2d Cir. 2012) (summary order) (quoting Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 198 (2d Cir. 1992)).  When a factual challenge to the Court's jurisdiction has been raised, "the court may resolve [any] disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits."  Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000).

B.    Rule 12(b)(6)

In deciding a Rule 12(b)(6) motion for failure to state a claim, the Court evaluates the sufficiency of the operative complaint under the "two-pronged approach" articulated by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  First, a plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and thus are not sufficient to withstand a motion to dismiss.  Id. at 678; Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  Ashcroft v. Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the complaint's allegations must meet a standard of "plausibility."  Ashcroft v. Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544,

564 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 556).

In considering a motion to dismiss, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010). In addition, the Court may consider materials subject to judicial notice, including court filings in other litigation, "not for the truth of the matters asserted in the other litigation but rather to establish the fact of such litigation and related filings." Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008).

II.     Subject Matter Jurisdiction

The Village Defendants challenge the Court's subject matter jurisdiction on several grounds, arguing: (i) plaintiffs' claims, to the extent they concern the moratorium, CUTA's informal application to build two new school buildings, or CUTA's request to renovate an existing building on its property, are not ripe for judicial review; (ii) all plaintiffs, except for CUTA, lack standing to assert any claim; (iii) plaintiffs' claims arising from the moratorium are moot; and (iv) the Court should abstain under Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976) [hereinafter Colorado River] from hearing claims related to the alleged discriminatory enforcement of the NOV.

For the following reasons, the Court agrees in part and disagrees in part regarding the Village Defendants' argument as to ripeness. The Court disagrees as to mootness and Colorado

River abstention.  Moreover, the Court disagrees with the Village Defendants' argument on standing, but in light of the recent Second Circuit decision Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona, 2019 WL 6975126 (2d Cir. Dec. 20, 2019) [hereinafter Tartikov IV], the Court sua sponte dismisses several of plaintiffs' claims for other reasons involving lack of standing.

    A.    Ripeness

Plaintiffs' facial challenge to the moratorium is ripe for review.  However, to the extent plaintiffs' claims rely on CUTA's informal application to build two new school buildings or its request to renovate an existing building on its property, they are not ripe for judicial review.

Ripeness is a jurisdictional requirement.  See Murphy v. New Milford Zoning Comm'n, 402 F.3d 342, 347 (2d Cir. 2005).  Thus, the Court cannot entertain plaintiffs' claims unless it "appears affirmatively from the record" that plaintiffs' claims are ripe.  Id.

"'[F]acial challenges to regulations are generally ripe the moment the challenged regulation or ordinance is passed."  Congregation Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona, 915 F. Supp. 2d 574, 595 (S.D.N.Y. 2013) (Karas, J.) [hereinafter Tartikov I] (collecting cases and quoting Suitum v. Tahoe Reg'l Planning Agency, 520 U.S. 725, 736 n.10 (1997)), aff'd sub nom. Tartikov IV, 2019 WL 6975126.

In contrast, as-applied challenges concerning a municipal land use decision must challenge a final decision as to how the property can be used.  Tartikov I, 915 F. Supp. 2d at 597–98 (collecting cases) (holding "the Second Circuit has applied [the final decision requirement] to as-applied challenges to land use laws under RLUIPA, the First Amendment, the Equal Protection Clause, . . . the Due Process Clause," and disputes arising under New York law).  Thus, a land use decision is not final until "a property owner submit[s] at least one

meaningful application for a variance." Murphy v. New Milford Zoning Comm'n, 402 F.3d at 348.

Courts recognize one exception permitting federal court review of a non-final land-use decision:  "if pursuing an appeal to a zoning board of appeals or seeking a variance would be futile." Murphy v. New Milford Zoning Comm'n, 402 F.3d at 349.  Futility exists when "a zoning agency lacks discretion to grant variances or has dug in its heels and made clear that all such applications will be denied." Id.  Additionally, "government authorities . . . may not burden property by imposition of repetitive or unfair land-use procedures in order to avoid a final decision." Sherman v. Town of Chester, 752 F.3d 554, 561 (2d Cir. 2014).  In such instances, "it is no simple task to distinguish procedures that are merely frustrating from those that are unfair or would be futile to pursue.  But when the government's actions are so unreasonable, duplicative, or unjust as to make the conduct farcical, the high standard is met." Id. at 563.

The futility exception must be interpreted narrowly. Missere v. Gross, 826 F. Supp. 2d 542, 555 (S.D.N.Y. 2011).  At least one district court in this Circuit has held "the futility exception does not discharge . . . an owner's obligation to file one meaningful development proposal." Tartikov I, 915 F. Supp. 2d at 602.  Relying on several cases from other circuits, the district court reasoned:

> Requiring one meaningful application ensures that local zoning authorities have at least one opportunity to consider how local regulations apply to a proposed use before the regulations are subject to judicial review. . . . Relatedly, the meaningful application requirement enables a court to consider the applicability of the challenged regulations to a formal plan, the precise details of which might well dictate the outcome of the litigation.

Id. at 603.

The Court agrees with Judge Karas's reasoning in Tartikov I and applies the same standard here.

1.      Facial Challenges to the Moratorium

Plaintiffs' facial challenges to the Village's interim land use development moratorium became ripe when the moratorium was passed on February 8, 2017. See Tartikov I, 915 F. Supp. 2d at 595.

2.      Application to Build Two New School Buildings

However, plaintiffs' claims respecting CUTA's application to build two new school buildings are not ripe for judicial review. There indisputably has been no final decision on CUTA's application to build the two new buildings. Further, because CUTA has not submitted a formal site plan application, it may not rely on the futility exception.

The Village Code establishes separate processes for CDRC and Planning Board review of informal and formal site development plan applications. (Village Code § 210-74(A)(1), available at https://ecode360.com/AI1857).[6] Indeed, the Village Code specifically states: "The informal submission shall not constitute a formal application, and no approval can be granted based on it." (Id.).

On the one hand, the Village Code states the CDRC "shall . . . review[]" an informal plan application prior to the next available Planning Board meeting, and "[t]he CDRC may opine as to whether an application is sufficiently complete to go before the Planning Board for formal

---

[6]     In their reply brief, the Village Defendants argue plaintiffs rely on a version of the Village Code that was passed over a year after CUTA last presented to the CDRC its informal plans to construct two new school buildings. Yet, the Village Defendants also relied on the supposedly new version of the Village Code, even attaching it to a prior declaration in support of their motion. (See Doc. #117 at 3; Doc. #116 ("Eleftherakis Decl.") Ex. F). Moreover, the second copy of the Village Code—the one supposedly controlling at the time CUTA presented its application to the CDRC—includes several Microsoft Word comments, raising doubts as to the document's authenticity and reliability. (See Doc. #141 ("Eleftherakis Reply Decl.") Ex. Y). Accordingly, the Court will not consider it. However, even if the Court did consider the supposedly older version, it would not alter the Court's decision.

review." (Id.).  Moreover, the Village Code provides the Planning Board "will review the proposed informal plan and may make such suggestions or such conditions as are necessary to ensure conformity of said plans with" the Village Code.  (Id. § 210-74(A)(3)).

On the other hand, after a developer applies to the Planning Board for formal site development review, the application must be scheduled for the CDRC meeting preceding the Planning Board meeting at which review is sought; the CDRC must determine if the application is complete and whether the site plan complies with Village Code requirements; and in the event the application is incomplete or fails to comply with the Village Code, "it may be rejected by the CDRC, in writing, within five days after the CDRC meeting."  (Village Code § 210-74(B)(1)). However, even if the CDRC rejects the formal application, the applicant may "proceed with the meeting before the Planning Board to discuss the application informally and to request any waivers from [the Village Code], or to correct the deficiencies and resubmit the plan for the next available meeting of the Planning Board."  (Id. § 210-74(B)(2)).

Here, CUTA submitted an informal application to the CDRC and to the Planning Board, in November and December 2016, respectively, but it never submitted a formal application. Neither the CDRC nor the Planning Board had authority to approve or reject the informal application.  Thus, the informal application was not a "meaningful development proposal." Tartikov I, 915 F. Supp. 2d at 602.

CUTA argues the CDRC, by refusing to make any technical recommendations on CUTA's informal application or refer it to the Planning Board, prevented CUTA from submitting its application for formal review.  Not so.  The Village Code does not allow the CDRC to refer an informal application to the Planning Board for formal review—in other words, to convert an informal application into a formal one.  Moreover, although the Village Code requires CUTA to

submit an informal plan to the CDRC prior to a formal application, nothing in the Village Code requires CUTA to wait for the CDRC to issue its recommendations before submitting a formal application to the Planning Board.

Accordingly, plaintiffs' federal and state law claims arising from CUTA's informal application to build two new school buildings are not ripe and are dismissed without prejudice.

### 3.  Renovation of an Existing Building

Similarly, plaintiffs' claims based on CUTA's request to renovate an existing building on the property are not ripe for judicial review because there has been no final decision pursuant to such a request.

Plaintiffs argue it would have been futile to apply formally for a permit to renovate its building because the Village Code requires site plan approval for every permit to be issued, and the moratorium would have precluded the Planning Board from taking up the request. Plaintiffs' argument falls short. The moratorium expired in September 2018, before plaintiffs commenced this lawsuit. Moreover, CUTA would still have been required to apply for a permit pursuant to Village Code § 210-144, which establishes the procedure for permit applications, because "in the absence of even one meaningful application, the Court cannot conclude that the Village's rejection of Plaintiffs' application is virtually certain, as required to demonstrate futility." Tartikov I, 915 F. Supp. 2d at 605–06 (collecting cases).

CUTA also argues that applying for an exemption from the moratorium would have been futile given the Village's demonstrated hostility and animus toward CUTA. However, "[e]vidence of hostility by local officials is . . . not alone enough to satisfy the futility exception." Town & Country Adult Living, Inc. v. Village/Town of Mount Kisco, 2019 WL 1368560, at *12 (S.D.N.Y. Mar. 26, 2019) (collecting cases).

Finally, to the extent CUTA relies on the assertion that Zummo orally denied CUTA a permit to renovate the building, "[i]nformal efforts to gain approval for land development are insufficient, by themselves, to constitute final government action." Goldfine v. Kelly, 80 F. Supp. 2d 153, 160 (S.D.N.Y. 2000). Plaintiffs also fail to allege they appealed Zummo's alleged denial of their request to the ZBA, pursuant to Village Code § 210-154.

Accordingly, plaintiffs' federal and state law claims arising from CUTA's alleged request to renovate an existing building on its property are not ripe and are dismissed without prejudice.

B.     Standing

In light of the recent Second Circuit decision, Tartikov IV, 2019 WL 6975126, the Court sua sponte dismisses for lack of standing the following claims, to the extent the claims rely on the moratorium: plaintiffs' (i) Section 1983 free exercise, free association, and due process claims, and (ii) RLUIPA substantial burden and exclusions and limits claims. See Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C., 433 F.3d 181, 198 (2d Cir. 2005) ("Because the standing issue goes to this Court's subject matter jurisdiction, it can be raised sua sponte.").

"A federal court's authority to adjudicate depends on whether the plaintiff has standing to pursue its claims." Tartikov IV, 2019 WL 6975126, at *18. To satisfy Article III's standing requirements, a plaintiff must show: (1) he "suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Pac. Capital Bank, N.A. v. Connecticut, 542 F.3d 341, 350 (2d Cir. 2008) (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180–81 (2000)). "It is the burden of the party invoking federal

jurisdiction to establish these three elements." Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills, 701 F. Supp. 2d 568, 581 (S.D.N.Y. 2010) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)). Moreover, "[a] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." Tartikov IV, 2019 WL 6975126, at *18. However, "at the pleading stage, standing allegations need not be crafted with precise detail." Baur v. Veneman, 352 F.3d 625, 631 (2d Cir. 2003).

In Tartikov IV, the Second Circuit concluded a congregation that hoped to build a rabbinical college had standing to pursue equal protection claims under the Fourteenth Amendment and nondiscrimination and equal terms claims under RLUIPA, because "discrimination . . . is an actual and concrete injury sufficient to confer standing." 2019 WL 6975126, at *19. However, the Second Circuit determined the congregation lacked standing to pursue free exercise, free speech, and free association claims, as well RLUIPA substantial burden and exclusions and limits claims, because the rabbinical college "never submitted a formal proposal for the building project, applied for a permit, or engaged in any other conduct that would implicate or invoke the operation of the challenged zoning laws." Id. Therefore, the Second Circuit reasoned, "[w]hatever harm may arise from the application of the zoning laws to [the congregation's] property is merely conjectural." Id.

Here, as concerns the 2017 moratorium, plaintiffs may pursue their Section 1983 equal protection and RLUIPA nondiscrimination and equal terms claims, but not their Section 1983 free exercise, free association, or due process claims, or RLUIPA substantial burden or exclusions and limits claims. Plaintiffs do not allege CUTA submitted a formal site plan application or an application to renovate its existing buildings while the moratorium was pending, nor do plaintiffs allege CUTA applied for an exception to the moratorium. Therefore,

as the Second Circuit held in <u>Tartikov IV,</u> whatever harm might have arisen from the enforcement of the moratorium to CUTA's applications "is merely conjectural at this time." 2019 WL 6975126, at *19.

For the same reason, plaintiffs lack standing to assert a due process claim premised on the moratorium. <u>Cf</u>. <u>MacPherson v. Town of Southampton</u>, 2013 WL 6058202, at *17 (E.D.N.Y. Nov. 14, 2013) ("Plaintiffs . . . do not have standing to bring their due process claims because they do not claim that they applied for rental permits to rent their properties and that they were denied said permits pursuant to the rental laws' provisions.").

Separately, the Village Defendants argue CUTA is the only party with standing to assert any claim.[7] CUTA's standing to assert claims against the Village Defendants is enough at this stage of proceedings: only one plaintiff needs to demonstrate standing with respect to each claim. <u>Tartikov IV</u>, 2019 WL 6975126, at *18.

Accordingly, the Court dismisses without prejudice plaintiffs' Section 1983 free exercise, free association, and due process claims, as well as their RLUIPA substantial burden and exclusions and limits claims, inasmuch as those claims rely on the moratorium.

C.     <u>Mootness</u>

Plaintiffs' remaining challenges to the moratorium are not moot.

"Mootness is a doctrinal restriction stemming from the Article III requirement that federal courts decide only live cases or controversies; a case is moot if the parties lack a legally cognizable interest in the outcome of the case." <u>In re Zarnel</u>, 619 F.3d 156, 162 (2d Cir. 2010). "This occurs when interim relief or events have eradicated the effects of the defendant's act or

---

[7]     The Village Defendants also argue only CUTA has standing to assert claims under RLUIPA. But only CUTA asserts any claim under RLUIPA. So, this is a non-issue.

omission, and there is no reasonable expectation that the alleged violation will recur." Id. "A party seeking to have a case dismissed as moot bears a heavy burden." Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ., 397 F.3d 77, 84 (2d Cir. 2005). "Claims for damages or other monetary relief automatically avoid mootness, so long as the claim remains viable." Dean v. Blumenthal, 577 F.3d 60, 66 (2d Cir. 2009).

The voluntary cessation doctrine holds that a defendant's "voluntary cessation of allegedly illegal conduct usually will render a case moot if the defendant can demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." Lamar Advert. of Penn, LLC v. Town of Orchard Park, 356 F.3d 365, 375 (2d Cir. 2004). A defendant's burden in establishing those elements is a "formidable" one, as it must be "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Holland v. Goord, 758 F.3d 215, 223 (2d Cir. 2014).

Plaintiffs' claims for damages are by definition not moot. See Dean v. Blumenthal, 577 F.3d at 66. Plaintiffs' claims for non-monetary relief also are not moot. Plaintiffs allege the Village Defendants would impose a similar moratorium in the future because of their hostility toward CUTA's plans to expand its Hasidic schools. Indeed, according to plaintiffs, defendants renewed the moratorium several times without good cause.

Defendants fail to offer any evidence in response; they merely argue plaintiffs' claims are moot because the moratorium expired before the lawsuit commenced. Accordingly, defendants have not carried their "formidable" burden to show it is "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Holland v. Goord, 758 F.3d at 223.

D.    Colorado River Abstention

The Village Defendants' final jurisdictional argument is the Court should abstain under Colorado River from hearing claims related to the alleged discriminatory enforcement of the NOV because CUTA has asserted the same claims in a previously filed and currently pending case in Supreme Court, Rockland County.

The Court disagrees.

Under Colorado River, "in certain . . . exceptional circumstances, . . . a federal court may abstain from exercising jurisdiction when parallel state-court litigation could result in comprehensive disposition of litigation and abstention would conserve judicial resources." Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist., 673 F.3d 84, 100 (2d Cir. 2012).

To prevail under Colorado River, the moving party must show (i) the federal and state actions are "parallel," meaning they involve substantially the same parties and issues, and (ii) the balance of a six-factor test weighs in favor of dismissal or a stay. Dittmer v. County of Suffolk, 146 F.3d 113, 118 (2d Cir. 1998); see also Village of Westfield v. Welch's, 170 F.3d 116, 121 (2d Cir. 1999). The six Colorado River factors are:

(1)    the assumption of jurisdiction by either court over any res or property;
(2)    the inconvenience of the federal forum;
(3)    the avoidance of piecemeal litigation;
(4)    the order in which jurisdiction was obtained;
(5)    whether state or federal law supplies the rule of decision; and
(6)    whether the state court proceeding will adequately protect the rights of the party seeking to invoke federal jurisdiction.

Village of Westfield v. Welch's, 170 F.3d at 121. "No single factor is necessarily decisive, . . . and the weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case." Id.

"Only the clearest of justifications" warrants dismissal or a stay. Colorado River, 424 U.S. at 819. Indeed, there is a "heavy presumption in favor of exercising jurisdiction." Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist., 673 F.3d at 104. Thus, "[w]here a Colorado River factor is facially neutral, that is a basis for retaining jurisdiction, not for yielding it." Id. at 101.

Assuming without deciding the state court action and this action are parallel, Colorado River abstention is inappropriate.

The first factor weighs against abstention because there is no property or res at issue. Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist., 673 F.3d at 101.

The second factor weighs against abstention because the federal forum is not inconvenient—the two fora are less than twenty miles apart. Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist., 673 F.3d at 101.

The third factor weighs against abstention. This factor supports abstention when granting a motion to dismiss or stay would eliminate the "risk of inconsistent outcomes not preventable by principles of res judicata and collateral estoppel." Woodford v. Cmty. Action Agency of Greene Cty., Inc., 239 F.3d 517, 524 (2d Cir. 2001). "The classic example arises where all of the potentially liable defendants are parties in one lawsuit, but in the other lawsuit, one defendant seeks a declaration of nonliability and the other potentially liable defendants are not parties." Id. (collecting cases). This is not a classic example—all of the parties remaining in the state court action are named in this action.

The fourth factor weighs in favor of abstention.  The fourth factor "does not turn

exclusively on the sequence in which the cases were filed, but rather in terms of how much

progress has been made in the two actions."  <u>Village of Westfield v. Welch's</u>, 170 F.3d at 122.

When there has not been "more progress in the state action than in the federal action, this factor

weighs against" granting a motion to dismiss or stay.  <u>Id</u>. at 123.  Here, the state court action was

filed first.  Moreover, in that action, the Village Defendants moved for summary judgment on

December 18, 2019.  Notice of Motion for Summary Judgment, <u>Cent. UTA of Monsey v. Village

of Airmont et al.</u>, No. 033675/2018 (Sup. Ct. Rockland Cty. Dec. 18, 2019), NYSCEF #124.

Thus, the state court action has progressed further than the instant action.

The fifth factor weighs against abstention.  "When the applicable substantive law is

federal, abstention is disfavored," and, even "the <u>absence</u> of federal issues does not strongly

advise dismissal, unless the state law issues are novel or particularly complex."  <u>Niagara

Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.</u>, 673 F.3d at 102.  Here, the

applicable substantive law on plaintiffs' RLUIPA and Section 1983 claims is federal.  Moreover,

as discussed <u>infra</u>, plaintiffs' state law claims are dismissed as duplicative.

Finally, the sixth factor weighs against abstention.  In analyzing this factor, "federal

courts are to determine whether the parallel state-court litigation will be an adequate vehicle for

the complete and prompt resolution of the issues between the parties."  <u>Village of Westfield v.

Welch's</u>, 170 F.3d at 124.  "If there is any substantial doubt as to this, it would be a serious abuse

of discretion to grant the stay or dismissal at all. . . .  Thus, the decision to invoke <u>Colorado River</u>

necessarily contemplates that the federal court will have nothing further to do in resolving any

substantive part of the case, whether it stays or dismisses."  <u>Moses H. Cone Mem'l Hosp.

v. Mercury Constr. Corp.</u>, 460 U.S. 1, 28 (1983).  CUTA seeks only declaratory relief in the state

court action, whereas here plaintiffs seek monetary damages in addition to declaratory relief.

Moreover, the state court action does not involve the District or any plaintiffs besides CUTA. In

addition, the only remaining claim in the state court action is an equal protection claim, whereas

plaintiffs assert several other claims in this action. Thus, this Court would have to resolve

numerous substantive issues in this case even if it stayed the case under <u>Colorado River</u>.

In sum, only one factor weighs in favor of abstention, and several factors weigh heavily

against it.

Accordingly, the Court will not stay under <u>Colorado River</u> plaintiffs' claims related to the

alleged discriminatory enforcement of the NOV.

III.     <u>Failure to State a Claim</u>[8]

The Village Defendants argue plaintiffs fail to state claims against them for (i) substantial

burden, equal terms, nondiscrimination, or exclusions and limits under RLUIPA; (ii) violation of

their right to free exercise of religion, intimate or expressive association, equal protection, or due

process under Section 1983; or (iii) conspiracy under Section 1985(3).

The District argues plaintiffs fail to state claims against it for (i) violation of their rights

to free exercise, intimate or expressive association, or equal protection under Section 1983; or

(ii) conspiracy under Section 1985(3).

As discussed further below, the Court first analyzes CUTA's RLUIPA substantial burden

claim together with plaintiffs' Section 1983 free exercise claim. <u>Roman Catholic Diocese of</u>

<u>Rockville Ctr., N.Y. v. Inc. Village of Old Westbury</u>, 128 F. Supp. 3d 566, 587 (E.D.N.Y. 2015)

---

[8]     As previously discussed, plaintiffs' claims based on the site plan application and
renovation of an existing building are not ripe, and plaintiffs lack standing to bring Section 1983
free exercise, freedom of association, or due process claims, or RLUIPA substantial burden or
exclusions or limits claims, based on the moratorium.

("Substantial burden claims under RLUIPA are intended to mirror the framework of First Amendment free exercise claims.").  Plaintiffs plausibly state those claims against the Village Defendants based on the NOV.  Plaintiffs also plausibly state a Section 1983 free exercise claim against the District.

Second, the Court analyzes CUTA's RLUIPA nondiscrimination and equal terms claims together with plaintiffs' Section 1983 equal protection claim.  <u>Tartikov IV</u>, 2019 WL 6975126, at *19 n.211 ("RLUIPA's nondiscrimination provision codifies the equal protection guarantees of the Fourteenth Amendment."); <u>Tartikov I</u>, 138 F. Supp. 3d at 442 (collecting cases) ("[T]he elements of a Nondiscrimination claim differ little, if at all, from an Equal Terms claim.").  Plaintiffs plausibly state RLUIPA nondiscrimination and equal terms claims and a Section 1983 equal protection claim against the Village Defendants based on both the NOV and the moratorium.  Plaintiffs also plausibly state a Section 1983 equal protection claim against the District.

Third, CUTA plausibly alleges the Village Defendants violated RLUIPA's exclusions and limits clause based on the NOV.

Fourth, plaintiffs state a plausible Section 1983 claim for violation of their right to expressive association against the Village Defendants based on the NOV and against the District.  However, plaintiffs fail plausibly to allege a violation of their right to intimate association against any defendant.

Fifth, plaintiffs plausibly state a Section 1983 due process claim against the Village Defendants based on the NOV.

Sixth, plaintiffs plausibly state a Section 1985(3) conspiracy claim against the Village Defendants and the District.

A.      RLUIPA Substantial Burden and Section 1983 Free Exercise Claims

Plaintiffs plausibly state a RLUIPA substantial burden claim and Section 1983 free exercise claim against the Village Defendants based on the NOV.  Plaintiffs also plausibly allege a Section 1983 free exercise claim against the District.

The First Amendment "prohibits the enactment of any law prohibiting the free exercise of religion." Bronx Household of Faith v. Cmty. Sch. Dist. No. 10, 127 F.3d 207, 215 (2d Cir. 1997).  "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." Commack Self-Serv. Kosher Meats, Inc. v. Hooker, 680 F.3d 194, 210 (2d Cir. 2012).  Indeed, "[i]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral, and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." Id.

In addition, "[t]he First Amendment generally prohibits government actions that substantially burden the exercise of sincerely held religious beliefs unless those actions are narrowly tailored to advance a compelling government interest." Fortress Bible Church v. Feiner, 694 F.3d 208, 220 (2d Cir. 2012).  "In other words, such actions are subject to strict scrutiny by reviewing courts." Id.  However, "[w]here the government seeks to enforce a law that is neutral and of general applicability, . . . then it need only demonstrate a rational basis for its enforcement, even if enforcement of the law incidentally burdens religious practices." Fifth Ave. Presbyterian Church v. City of New York, 293 F.3d 570, 574 (2d Cir. 2002).

"A substantial burden exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." Newdow v. Peterson, 753 F.3d 105, 109 (2d Cir. 2014).  "Moreover, when [a state actor's] actions are arbitrary, capricious, unlawful, or taken in

bad faith, a substantial burden may be imposed because it appears that the applicant may have been discriminated against on the basis of its status as a religious institution." Fortress Bible Church v. Feiner, 694 F.3d at 219. "[C]ourts have held that zoning schemes which impose conditions on the use of the property, such as limitations on the size of the facilities to be used by the religious institution, can impose a substantial burden." Tartikov I, 915 F. Supp. 2d at 631–32 (collecting cases). "Courts also have found religious institutions have satisfied the substantial burden requirement by alleging or proving that a municipality's zoning scheme imposes significant delay, uncertainty, and expense." Id. at 632 (collecting cases).

"At the pleadings stage, a plaintiff need only allege a prima facie violation; an analysis of whether the government has shown a compelling government interest or the use of least restrictive means is more appropriately addressed in connection with summary judgment." Roman Catholic Diocese of Rockville Ctr., N.Y. v. Inc. Village of Old Westbury, 2012 WL 1392365, at *7 (E.D.N.Y. Apr. 23, 2012).

1.   Village Defendants

Plaintiffs sufficiently allege defendant Code Enforcer Fontana's issuance of the NOV, and the Village Defendants' enforcement of the NOV, substantially burdened their religious exercise. Plaintiffs allege as a result of the NOV, CUTA faces a substantial monetary penalty, has reduced the number of students whom it may enroll and charge tuition, lost its construction loan, is unable to acquire clear title on its property, and is consequently defaulting on its mortgage. Plaintiffs also allege the NOV led to the District's decision to stop providing CUTA transportation and special needs services and caused CUTA to temporarily lose their tax exemption.

Likewise, plaintiffs allege the Village enforced the 167-student maximum in the certificate of occupancy only after CUTA acquired the property to build a large Hasidic school, plausibly alleging the Village's actions were "arbitrary, capricious, unlawful, or taken in bad faith." Fortress Bible Church v. Feiner, 694 F.3d at 219. Specifically, plaintiffs allege Ateres— the non-Hasidic school that operated on CUTA's property for many years before CUTA acquired the property and started operating Hasidic schools—enrolled over 400 students annually, and the Village never issued or enforced an NOV against Ateres. Moreover, plaintiffs allege Camp Regesh hosted approximately 600 students on the property before the 2001 site plan was approved, and the building inspector at that time did not require Camp Regesh to amend its site plan.

Plaintiffs also allege Village officials knew Ateres was hosting more than 167 students. According to plaintiffs, aside from the fact that Ateres operated on the same street as the Village Hall, the Village's building inspector from 2005 to 2015 knew Ateres's student enrollment exceeded the 167-student maximum in the certificate of occupancy. In addition, plaintiffs allege at a CDRC meeting in October 2014, the CDRC acknowledged 400 students attended Ateres.

Accordingly, plaintiffs plausibly state an RLUIPA substantial burden claim and a Section 1983 free exercise claim against the Village Defendants based on the NOV.

### 2.     The District

Plaintiffs also sufficiently allege the District's actions in failing to provide CUTA with transportation and special needs services substantially burdened the exercise of their religious beliefs and were "arbitrary, capricious, unlawful, or taken in bad faith." Fortress Bible Church v. Feiner, 694 F.3d at 219. Specifically, according to plaintiffs, the District provided transportation and special needs services to Ateres, a non-Hasidic school, for over fifteen years. Plaintiffs

allege the District stopped providing those services only when CUTA took over the school. Plaintiffs also allege they have provided the District with all documents necessary to register for transportation services.

Moreover, to the extent the District argues it is merely following state law in denying transportation and other services, that argument goes to whether the District has shown a compelling interest for such conduct, which is not properly addressed at this time.  Roman Catholic Diocese of Rockville Ctr., N.Y. v. Inc. Village of Old Westbury, 2012 WL 1392365, at *7.

Accordingly, plaintiffs plausibly state a Section 1983 free exercise claim against the District.

B.      RLUIPA Nondiscrimination and Equal Terms, and Section 1983 Equal Protection Claims

Plaintiffs plausibly state RLUIPA nondiscrimination and equal terms claims against the Village Defendants and Section 1983 equal protection claims against both the Village Defendants and the District.

"The Equal Protection Clause requires that the government treat all similarly situated people alike."  Harlen Assocs. v. Inc. Village of Mineola, 273 F.3d 494, 499 (2d Cir. 2001).  "To state a claim for an equal protection violation, appellants must allege that a government actor intentionally discriminated against them on the basis of race, national origin or gender."  Hayden v. County of Nassau, 180 F.3d 42, 48 (2d Cir. 1999).  A plaintiff may do so by alleging:  (i) "a law that expressly classifies on the basis of [religion]," (ii) "a facially neutral law or policy that has been applied in an unlawfully discriminatory manner," or (iii) "a facially neutral policy that has an adverse effect and that was motivated by discriminatory animus."  Pyke v. Cuomo, 567

F.3d 74, 76 (2d Cir. 2009) (per curiam); <u>see also</u> <u>Tartikov IV</u>, 2019 WL 6975126 (applying same standard to claim for discrimination based on religion).

Concerning the third method of alleging intentional discrimination, "[d]iscriminatory purpose implies that the decisionmaker selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its <u>adverse</u> <u>effects</u> upon an identifiable group." <u>Hayden v. County of Nassau</u>, 180 F.3d at 50. "Discriminatory intent or purpose typically refers to those instances when a government actor seeks to disadvantage or negatively impact a group of persons." <u>Id</u>. (collecting cases).

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." <u>Village of Arlington Heights v. Metro. Hous. Dev. Corp.</u>, 429 U.S. 252, 266 (1977). Subjects of proper inquiry include: "the historical background of the decision[,] particularly if it reveals a series of official actions taken for invidious purposes," "departures from the normal procedural sequence," "substantive departures," and "the legislative or administrative history[,] especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." <u>Hayden v. Paterson</u>, 594 F.3d at 163.

1. NOV and Certificate of Occupancy

For the same reasons the Court concludes plaintiffs plausibly alleged the Village Defendants' and District's actions were arbitrary, capricious, unlawful, or taken in bad faith, plaintiffs plausibly allege (i) the Village Defendants applied the Village Code in an unlawfully discriminatory manner, and (ii) the District applied its requirement that schools have valid certificates of occupancy in an unlawfully discriminatory manner.

The Village Defendants argue plaintiffs fail to support their claims with any comparators. However, "[a] plaintiff alleging an equal protection claim under a theory of discriminatory application of the law, or under a theory of discriminatory motivation underlying a facially neutral policy or statute, generally need not plead or show the disparate treatment of other similarly situated individuals." Pyke v. Cuomo, 258 F.3d 107, 108–09 (2d Cir. 2001).[9]

  2. Moratorium

Plaintiffs also plausibly allege the Village Defendants were motivated by discriminatory animus when they passed the moratorium, and that the moratorium had an adverse effect on them. Plaintiffs allege the Board of Trustees discussed implementing the moratorium "[i]n direct response to [CUTA's] application." (Am. Compl. ¶ 148). According to plaintiffs, a member of the ZBA specifically mentioned houses of worship as a reason the Village should impose a moratorium, and the only houses of worship in contemplation of construction or renovation in the Village were Hasidic Jewish synagogues. Moreover, the Village allegedly extended the moratorium three times, even though there was no good cause for the extensions. Finally, plaintiffs allege Mayor Gigante and other members of the Board of Trustees are members of Preserve Airmont, a political party intent on limiting the growth of the Hasidic community, and campaigned on anti-Hasidic platforms. Cf. Bloomingburg Jewish Educ. Ctr. v. Village of Bloomingburg, 111 F. Supp. 3d 459, 469, 487 (S.D.N.Y. 2015) (holing plaintiffs sufficiently

---

[9] None of the parties differentiates between a Pyke equal protection claim (discussed above) and a selective enforcement claim pursuant to LeClair v. Saunders, 627 F.2d 606 (2d Cir. 1980), which does require plaintiffs to allege they were treated differently from similarly situated individuals. See TAL Properties of Pomona, LLC v. Village of Pomona, 2019 WL 3287983, at *8 n.6 (S.D.N.Y. July 22, 2019) ("There is a difference between a Pyke claim, which sounds in racially discriminatory treatment, and a LeClair claim of selective enforcement."), appeal filed, No. 19-2247 (2d Cir. July 23, 2019). As the parties did not separately brief whether plaintiffs sufficiently state a LeClair claim, the Court does not reach the issue in deciding the instant motion.

alleged discriminatory animus against members of Board of Trustees who were "elected on what are alleged to have been anti-Hasidic platforms" and with support from an advocacy organization intent on "blocking Hasidic Jews" from moving into the village and "making life difficult for those who already live there").

As for discriminatory effect, once discriminatory intent "infects the application of a neutral law or policy . . . adverse effects can be presumed." Doe v. Village of Mamaroneck, 462 F. Supp. 2d 520, 543 (S.D.N.Y. 2006).

Accordingly, plaintiffs plausibly state RLUIPA nondiscrimination and equal terms claims and Section 1983 equal protection claims against the Village Defendants based on both the NOV and the moratorium. Plaintiffs also plausibly state Section 1983 equal protection claims against the District.

C.      RLUIPA Exclusions and Limits Claim

CUTA has plausibly alleged the Village Defendants violated RLUIPA's exclusions and limits clause based on the NOV.

RLUIPA's exclusions and limits provision states: "No government shall impose or implement a land use regulation that— (A) totally excludes religious assemblies from a jurisdiction; or (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction." 42 U.S.C. § 2000cc(b)(3). "The purpose of this provision is not to examine the restrictions placed on individual landowners, but to prevent municipalities from broadly limiting where religious entities can locate." Tartikov I, 915 F. Supp. 2d at 637.

For the reasons discussed above, plaintiffs plausibly allege an RLUIPA exclusions and limits claim based on the NOV.

D.     <u>Section 1983 Freedom of Intimate and Expressive Association Claim</u>

The term "Freedom of Association" refers to two distinct rights: "(i) choices to enter into and maintain certain intimate human relationships and (ii) association for the purpose of engaging in those activities protected by the First Amendment." <u>Tartikov I</u>, 915 F. Supp. 2d at 627 (collecting cases).

1.     <u>Right to Intimate Association</u>

Plaintiffs fail plausibly to allege a violation of their right to intimate association against either the Village Defendants or the District.

The source of the right to intimate association "has not been authoritatively determined." <u>Piscottano v. Murphy</u>, 511 F.3d 247, 278 (2d Cir. 2007). Nonetheless, "[t]he relationships that have been recognized as entitled to protection under [the right to intimate association] are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." <u>Id</u>. "Relationships that exemplify constitutionally protected intimate associations are those that attend the creation and sustenance of a family, such as marriage, childbirth, the raising and education of children, and cohabitation with one's relatives." <u>Id</u>. "Entities such as large business enterprises, on the other hand, are remote from the concerns giving rise to this constitutional protection." <u>Id</u>.

To determine whether a governmental rule unconstitutionally infringes on a right to intimate association, "courts balance the strength of the associational interest in resisting governmental interference with the state's justification for the interference." <u>Chi Iota Colony of Alpha Epsilon Pi Fraternity v. City Univ. of New York</u>, 502 F.3d 136, 143 (2d Cir. 2007). In making that determination, courts assess the following factors: "(1) the strength of the

associational interests asserted and their importance to the plaintiff; (2) the degree to which the rule interferes with those interests; (3) the public interests or policies served by the rule imposed; and (4) the tailoring of the rule to effectuate those interests or policies." Id. "The more important the associational interest asserted, and the more the challenged governmental rule burdens the associational freedom, the more persuasive must be the state's reasons for the intrusion, and the more precisely tailored the state's policy must be." Id.

"Courts have recognized the parental liberty interest only where the behavior of the state actor compelled interference in the parent-child relationship." Anspach ex rel. Anspach v. City of Philadelphia, Dep't of Pub. Health, 503 F.3d 256, 262 (3d Cir. 2007).

Here, plaintiffs fail plausibly to allege the Village or District's actions interfered in their relationships with their children. The relationship between the NOV with plaintiffs' right to raise and educate their children is attenuated at best. Nothing in the amended complaint suggests the NOV requires plaintiffs to send their children to a school of which they disapprove or requires the children to study in environment contrary to their belief systems. Indeed, the NOV leaves plaintiffs' relationships with their children completely untouched. And the same is true of the effects of the District's certificate of occupancy requirement—it does not interfere with any of plaintiffs' relationships with their children.

Accordingly, plaintiffs' Section 1983 claim against the District and Village Defendants for violation of their right to intimate association is dismissed.

2.    Right to Expressive Association

However, plaintiffs plausibly allege a Section 1983 claim against the Village Defendants and the District for violation of their right to expressive association.

"Implicit in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." Tabbaa v. Chertoff, 509 F.3d 89, 101 (2d Cir. 2007). "The first question . . . is whether and to what extent defendants' actions burdened that right." Id. "Mere incidental burdens on the right to associate do not violate the First Amendment; rather, to be cognizable, the interference with plaintiffs' associational rights must be direct and substantial or significant." Id.

If there is a cognizable burden, the Court "must next determine the appropriate level of scrutiny to employ in evaluating defendants' actions": "an infringement on associational rights is not unconstitutional so long as it serves compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." Tabbaa v. Chertoff, 509 F.3d at 102.

As discussed above, plaintiffs plausibly allege the Village Defendants and District's actions substantially burdened the exercise of their religious beliefs. Plaintiffs allege the Village Defendants issued the NOV to limit the number of students that may attend CUTA's schools and the District refused to provide transportation services to CUTA. Plaintiffs plausibly allege those actions restrict CUTA's students' abilities to associate with others in pursuit of religious ends. Cf. Tartikov I, 915 F. Supp. 2d at 625 (holding plaintiffs stated a viable freedom of expressive association claim because plaintiffs alleged "they wish[ed] to construct and operate a rabbinical college to foster the expression of certain ideas among and between faculty members and students.").

Further, the Village Defendants' argument that the NOV serves compelling state interests is more appropriately addressed at summary judgment. Roman Catholic Diocese of Rockville Ctr., N.Y. v. Inc. Village of Old Westbury, 2012 WL 1392365, at *7.

Accordingly, plaintiffs' Section 1983 claim against the Village Defendants based on the NOV for violation of their right to expressive association may proceed.

E.    Due Process Claim

The Village Defendants argue plaintiffs' due process claim is limited to the Village's enactment and enforcement of the building moratorium, which the Court dismissed supra for lack of standing. Although the amended complaint is hardly a model of clarity—indeed, it is impossible to tell whether plaintiffs assert a procedural or substantive due process claim—the amended complaint plainly asserts a due process claim based on the issuance of the NOV. (Am. Compl. ¶ 425 ("Under the Village Code, Central UTA had a clear legal right to use its property for a school for as many students as it wanted as it obtained the necessary regulatory approvals including fire safety certificates. Indeed, the Village Defendants never enforced any student enrollment limitation against Ateres, a private non-Hasidic school, that operated on the Property prior to Central UTA's ownership.").

Accordingly, plaintiffs' due process claim against the Village Defendants based on the NOV may proceed.

F.    Conspiracy Claim

Finally, plaintiffs plausibly allege a conspiracy claim under Section 1985(3).

To state a conspiracy claim under Section 1985(3), plaintiffs must allege "(1) a conspiracy, (2) for the purpose of depriving any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws, (3) an act in

furtherance of the conspiracy, and (4) whereby a person is injured in his person or property or deprived of a right or privilege of a citizen." Iqbal v. Hasty, 490 F.3d 143, 176 (2d Cir. 2007), rev'd on other grounds, Ashcroft v. Iqbal, 556 U.S. 662 (2009). To state a claim under Section 1985(3), plaintiffs must also allege the conspiracy was motivated by some racial or other class-based discriminatory animus. See Gagliardi v. Village of Pawling, 18 F.3d 188, 194 (2d Cir. 1994).

"A conspiracy need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct." Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999). However, plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." Webb v. Goord, 340 F.3d 105, 110 (2d Cir. 2003).

Plaintiffs sufficiently allege a conspiracy claim against the Village Defendants and the District. They claim that when CUTA first requested the District provide transportation services, the District consulted with Village officials and only then refused to provide those services. Moreover, plaintiffs allege that when CUTA resubmitted its documents to the District, the District again contacted the Village and requested additional documentation from Zummo. Finally, according to plaintiffs, when they sent their documents to the District a third time, the District again stated it was waiting for guidance from the Village. In other words, every time CUTA attempted to register with the District, the District consulted with Village officials before rejecting CUTA's application. Although hardly conclusive, these allegations plausibly suggest a meeting of the minds between the Village Defendants and the District.

Moreover, for the reasons discussed above regarding plaintiffs' Section 1983 and RLUIPA claims, plaintiffs likewise allege sufficient facts suggesting the agreement between the Village Defendants and the District was motivated by discriminatory animus.

Accordingly, plaintiffs' Section 1985(3) conspiracy claim against the Village Defendants and the District may proceed.[10]

## IV. Individual Liability

The Village Defendants argue plaintiffs fail to state Section 1983 claims against the twenty-two individual Village Defendants. Specifically, the Village Defendants argue (i) the members of the Board of Trustees are entitled to legislative immunity for their votes to enact and extend the 2017 moratorium; (ii) the eight members of the Planning Board and five members of the Board of Trustees were not personally involved in any alleged constitutional injury; and (iii) all remaining individual defendants are entitled to qualified immunity.

As explained below, the individual members of the Board of Trustees are entitled to legislative immunity for their votes to enact or extend the moratorium. Further, although plaintiffs plausibly allege the personal involvement of Mayor Gigante, they fail to do so as to the other four members of the Board of Trustees or the eight members of the Planning Board. Plaintiffs also fail to allege the personal involvement of Village Attorney Mack, Deputy Village Attorney Kraushaar, or Village Clerk and Treasurer DiMarsico-Smith. And no defendant is entitled to qualified immunity at this time.

---

[10]     However, to the extent plaintiffs allege the Village Defendants conspired among themselves—as distinguished from an alleged conspiracy between the Village Defendants and the District—to deprive plaintiffs of their constitutional rights, plaintiffs' claim fails. See Hartline v. Gallo, 546 F.3d 95, 99 (2d Cir. 2008) ("[U]nder the intracorporate conspiracy doctrine, officers, agents and employees of a single corporate entity are legally incapable of conspiring together.").

In addition, plaintiffs' claims against the individual defendants in their official capacities are dismissed. Those claims are deemed brought against the Village. See Patterson v. County of Oneida, 375 F.3d 206, 226 (2d Cir. 2004).

A.    Legislative Immunity

The five members of the Board of Trustees are entitled to legislative immunity for their votes to enact and extend the moratorium.

"Legislators are entitled to absolute immunity from civil liability for their legislative activities." Harhay v. Town of Ellington Bd. of Educ., 323 F.3d 206, 210 (2d Cir. 2003). "[A]bsolute legislative immunity for Section 1983 actions extends to local legislators." Id. "Legislative immunity applies to actions that are both '(1) substantively legislative, i.e., acts that involve policy making,' and '(2) procedurally legislative, i.e., passed by means of established legislative procedures.'" Bloomingburg Jewish Educ. Ctr. v. Village of Bloomingburg, 111 F. Supp. 3d at 491 (quoting State Emps. Bargaining Agent Coal. v. Rowland, 494 F.3d 71, 89 (2d Cir. 2007)).

Here, "[t]he passage of the Moratorium was undoubtedly a legislative act." Bloomingburg Jewish Educ. Ctr. v. Village of Bloomingburg, 111 F. Supp. 3d at 492.

Accordingly, all five members of the Board of Trustees are entitled to legislative immunity for their votes to enact and extend the moratorium.

B.    Personal Involvement

The Village Defendants argue plaintiffs fail to state claims for relief under Section 1983 against the individual members of the Planning Board or Board of Trustees, because they were not personally involved in any alleged constitutional injury against plaintiffs.

The Court agrees, except as to Mayor Gigante. In addition, plaintiffs fail to allege the personal involvement of Village Attorney Mack, Deputy Village Attorney Kraushaar, or Village Clerk and Treasurer DiMarsico-Smith.

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983." Wright v. Smith, 21 F.3d 496, 501 (2d. Cir. 1994). "Supervisor liability under § 1983 can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003) (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)).[11]

Plaintiffs fail to allege the personal involvement of the individual members of the Planning Board. Plaintiffs' claims against the eight members of the Planning Board—John Cornelius, Doug Whipple, Anthony Santucci, William Philip, Russel Hock, Pavle Lecei, Ken Brezner, and Suzanne Carley—arise only from plaintiffs' allegations involving the Village's alleged refusal to review or provide comment on CUTA's site plan application. As the Court previously discussed, those claims are not yet ripe.

---

[11]     Since Ashcroft v. Iqbal, district courts within the Second Circuit have been divided as to whether claims alleging personal involvement under the second, fourth, and fifth of these factors remain viable. See Marom v. City of New York, 2016 WL 916424, at *15 (S.D.N.Y. Mar. 7, 2016) (collecting cases), on reconsideration in part, 2016 WL 5900217 (S.D.N.Y. July 29, 2016). The Second Circuit has yet to resolve this dispute. Id.

The same is true as to four of five members of the Board of Trustees: defendants Peter Blunnie, Kevin Warbrick, Paul Marchesani, and Anthony Valvo. Plaintiffs' claims against those four members of the Board of Trustees focus on their passing of the moratorium, for which they are entitled to legislative immunity. Plaintiffs also allege the Board of Trustees members discussed how to have CUTA's tax exemption revoked based on the NOV, but those alleged discussions occurred in January 2018, months after the NOV was issued in August 2017. Plaintiffs do not allege the Board of Trustees members otherwise played roles in issuing or enforcing the NOV. The only other allegations against them are that they are members of Preserve Airmont, a political party with a supposedly anti-Hasidic platform, and campaigned on anti-Hasidic platforms. But that alone is insufficient to allege their personal involvement in the alleged constitutional deprivations.

The same is not true as to Mayor Philip Gigante. Plaintiffs allege a CUTA representative met with Mayor Gigante on July 20, 2016, "to discuss future plans for the 21-acre Property," and the CUTA representative told Mayor Gigante that CUTA intended to add a new building and replace some of the existing buildings to accommodate for growth in enrollment. (Am. Compl. ¶ 138). According to plaintiffs, that meeting was the impetus for the Village's alleged "coordinated crusade of dilatory and discriminatory tactics" to prevent CUTA from expanding its religious school. Such allegations are plausible because the meeting occurred before the NOV was issued in August 2017. Thus, plaintiffs sufficiently allege Mayor Gigante's personal involvement in the alleged constitutional deprivations.

Plaintiffs fail to allege the personal involvement of Village Clerk and Treasurer DiMarsico-Smith—the only allegation against her is that she was copied on an email. Cf. Frankel v. N.Y. State of Children & Family Servs., 2013 WL 10349678, at *11 (S.D.N.Y. Apr.

20, 2013), report and recommendation adopted as modified sub nom. Frankel v. N.Y. Office of Children & Family Servs., 2015 WL 1290973 (S.D.N.Y. Mar. 23, 2015) (holding supervisor who was merely copied on an email was not personally involved in alleged constitutional deprivation).

Plaintiffs also fail to allege the personal involvement of Deputy Village Attorney Kraushaar.  Plaintiffs allege (i) Kraushaar wrote an email before a Planning Board meeting stating the meeting may need to be adjourned because of lack of space, and (ii) in January 2017, CUTA wrote to Kraushaar to argue that their certificate of occupancy was valid, but Kraushaar never responded.  The first allegation goes to an unripe claim.  The second allegation concerns mere receipt of an email, which alone is insufficient to allege an official's personal involvement. See Frankel v. New York State of Children & Family Servs., 2013 WL 10349678, at *11.

Similarly, plaintiffs fail to allege the personal involvement of Village Attorney Mack. Plaintiffs allege Mack advised Zummo not to issue an operating permit, which goes to an unripe claim.  Plaintiffs further allege Mack wrote an email stating CUTA was receiving tax exemptions without certificates of occupancy, but that occurred in March 2018, after the NOV was issued.

Accordingly, plaintiffs' Section 1983 claims against the Planning Board (John Cornelius, Doug Whipple, Anthony Santucci, William Philip, Russel Hock, Pavle Lecei, Ken Brezner, and Suzanne Carley); four members of the Board of Trustees (Peter Blunnie, Kevin Warbrick, Paul Marchesani, and Anthony Valvo); and Village Attorney Sean Mack, Deputy Village Attorney David Kraushaar, and Village Clerk and Treasurer Lisa-Ann DiMarsico-Smith are dismissed. Plaintiffs' claims against Mayor Philip Gigante, however, may proceed.

C.     Qualified Immunity

The Village Defendants argue all remaining individual defendants—Mayor Gigante, the four members of the ZBA, Building Inspector Zummo, and Code Enforcer Fontana—are entitled to qualified immunity.

The Court disagrees.

Qualified immunity shields government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The scope of qualified immunity is broad, and it protects "all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).  "Defendants bear the burden of establishing qualified immunity."  Garcia v. Does, 779 F.3d 84, 92 (2d Cir. 2015).

"The issues on qualified immunity are:  (1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was 'clearly established'; and (3) even if the right was 'clearly established,' whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful."  Gonzalez v. City of Schenectady, 728 F.3d 149, 154 (2d Cir. 2013).

First, as discussed above, plaintiffs have stated plausible claims for relief, including for, among other things, violation of their right to equal protection.  Second, "[i]t is well settled that enforcement of an otherwise valid zoning ordinance violates the Constitution if the decision of the particular zoning body is arbitrary, or if the ordinance is applied or enforced with a discriminatory intent or purpose."  Brady v. Town of Colchester, 863 F.2d 205, 217 (2d Cir. 1988).  And third, for the reasons discussed above, at this stage the Court cannot find the individual defendants' actions were objectively reasonable.

Accordingly, the remaining individual defendants are not entitled to qualified immunity at this time.

V.    <u>Non-Suable Entities</u>

The Court dismisses claims against the Board of Trustees, ZBA, Planning Board, and Building Department, because they are mere administrative arms of the Village—<u>i.e.</u>, not suable entities.  <u>See</u> <u>Town & Country Adult Living, Inc. v. Village/Town of Mount Kisco</u>, 2019 WL 1368560, at *13 (collecting cases).

VI.   <u>Monell Claim</u>

The District argues plaintiffs fail to state a claim against it pursuant to <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978).

The Court disagrees.

Under <u>Monell</u>, a municipality is liable under Section 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [plaintiff's] injury."  <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. at 694.  Thus, to assert a Section 1983 claim against the District, plaintiff must allege the existence of an official policy or custom that caused injury and a direct causal connection between that policy or custom and the deprivation of a constitutional right.  <u>See Jones v. Town of E. Haven</u>, 691 F.3d 72, 80 (2d Cir. 2012).

A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:  (i) "a formal policy officially endorsed by the municipality"; (ii) "actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question"; (iii) "a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must

have been aware"; or (iv) "a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." Brandon v. City of New York, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010).

"While Monell claims are not subject to a 'heightened' pleading standard beyond that defined in Rule 8(a)(2), . . . such claims nevertheless must meet the plausibility requirements of [Bell Atlantic Corp. v. Twombly, 550 U.S. at 572], and [Ashcroft v. Iqbal, 556 U.S. at 678]." Guzman v. United States, 2013 WL 5018553, at *4 (S.D.N.Y. Sept. 13, 2013) (citing Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168 (1993)). "In other words, boilerplate allegations will not suffice." Id. at *3.

Plaintiffs' allegations against the District satisfy Monell at this stage. Plaintiffs claim the District has a policy of denying CUTA transportation or special needs services, as evidenced by their multiple refusals of CUTA's applications to register with them. And according to plaintiffs, the District has never provided transportation or special needs services to CUTA, despite providing those same services for years to Ateres.

Accordingly, plaintiffs' allegations satisfy Monell at this stage.

VII.    State Law Claims

Plaintiffs' New York state law claims under Sections 3, 6, and 11 of the New York Constitution are dismissed as duplicative.

"The New York Constitution's due process, equal protection, and free exercise protections are essentially coextensive with those provided by the federal Constitution." Bloomingburg Jewish Educ. Ctr. v. Village of Bloomingburg, 111 F. Supp. 3d at 482 (collecting

cases). "There is no private right of action for violations of the New York State Constitution where alternative remedies exist, for example under § 1983." Id.

Accordingly, plaintiffs' state law claims are dismissed.

VIII.    Preliminary Injunction

Plaintiffs seek a preliminary injunction requiring the District to provide CUTA with transportation services based on the District's alleged violation of plaintiffs' free exercise and equal protection rights.

That motion is denied.

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Sussman v. Crawford, 488 F.3d 136, 139 (2d Cir. 2007).

"To secure a preliminary injunction . . . the moving party must demonstrate (1) that it will be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of the case to make it a fair ground for litigation, and a balance of hardships tipping decidedly in its favor." MONY Grp., Inc. v. Highfields Capital Mgmt., L.P., 368 F.3d 138, 143 (2d Cir. 2004).

"A party moving for a mandatory injunction that alters the status quo by commanding a positive act must . . . make a clear or substantial showing of a likelihood of success on the merits, a standard especially appropriate when a preliminary injunction is sought against government." D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ., 465 F.3d 503, 510 (2d Cir. 2006), opinion amended on denial of reh'g, 480 F.3d 138 (2d Cir. 2007).

Plaintiffs fail to make a clear or substantial showing of a likelihood of success on the merits on either their free exercise or equal protection claims. As to plaintiffs' free exercise

claim, plaintiffs fail to show the District's failure to provide transportation services discriminates against them based on their religious beliefs or constitutes a substantial burden on the exercise of their religious beliefs. And on plaintiffs' equal protection claim, plaintiffs fail to show the District intentionally discriminated against them.

First, the District Board of Education revised its transportation policy on March 15, 2016, and plaintiffs have not presented any evidence they have complied with the policy. The new policy requires schools in the District to register with the District by providing, among other things, "a copy of their current and valid Certificate of Occupancy," before the District provides transportation services. (Doc. #119 ("Silverman Decl.") Ex. E).

Plaintiffs have not presented evidence they provided the District with a valid certificate of occupancy for CUTA's girls' school. Indeed, this entire lawsuit arises from the fact that the Village issued an NOV after it determined CUTA was operating a school for several hundred students when its certificate of occupancy was limited to a school for 167 students. And, in an Article 78 proceeding, a state court upheld the ZBA's decision to affirm the NOV "on the ground that [CUTA] did not have a CO to operate a school for 200-300 students" as "not illegal, arbitrary, capricious, or an abuse of discretion." Cent. UTA of Monsey v. Village of Airmont et al., No. 033675/2018, at 15 (Sup. Ct. Rockland Cty. Mar. 12, 2019), NYSCEF #89. The state court reasoned: "The Site Plan Resolution and COs in effect limit the number of students to no more than 167. There is no subsequent amendment to the plan which increases or even addresses the number of permitted students." Id.

In other words, at this point, CUTA is essentially asking this Court to order the District to provide transportation services in violation of its policy requiring a valid certificate of occupancy, and has presented no good reason for doing so.

Second, the new board policy was not in place when Ateres was provided with transportation services. Ateres, therefore, is not a similarly situated comparator, because it was not required to provide the District with a valid certificate of occupancy to receive transportation services.

Third, plaintiffs' own evidence shows CUTA is running two schools—one for boys and one for girls—and the District is providing transportation services to the boys' school. According to the District, CUTA has provided the District with all required documentation for the boys' school, including a valid certificate of occupancy. Indeed, according to the District, it provided transportation services to both CUTA's boys and girls schools in the 2015–2016 school year, before the schools moved to new properties and were required to register under the new transportation policy.[12]

Plaintiffs argue the District's failure to provide transportation services violates New York Education Law § 3635, which requires school districts to provide transportation "for all the children residing within the school district to and from the school they legally attend." However, there is no claim in plaintiffs' amended complaint for violation of that law, nor a claim that the board's registration requirement violates that law or is facially unconstitutional. In addition, Section 3635 does not prohibit a district from adopting measures to ensure safe and efficient transportation services, as the District's policy states it is intended to do. Thus, plaintiffs' argument is unavailing.

---

[12] Inexplicably, the District failed to submit any evidence in opposition to the motion, and thus these latter contentions are contained in their unsworn opposition brief. Nonetheless, plaintiffs do not dispute them in their reply brief, and thus the Court accepts them as true for purposes of this motion.

Finally, plaintiffs assert the District made several additional changes to their transportation services policy that disproportionately affect religious schools, such as providing only one scheduled pick-up and drop-off time for each nonpublic school. But plaintiffs did not challenge those changes in the amended complaint—rather, they mention them for the first time in their motion for a preliminary injunction. Thus, the Court will not grant relief regarding those changes. And to the extent plaintiffs argue those changes are additional evidence of the District's discrimination against them based on their religious beliefs, that evidence is insufficient to establish a clear or substantial showing of a likelihood of success on the merits.

Accordingly, the Court will not issue the requested preliminary injunction.

## CONCLUSION

The Village Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

The District's motion to dismiss is DENIED.

Plaintiffs' motion for a preliminary injunction is DENIED.

The following claims are dismissed without prejudice: (i) plaintiffs' federal and state law claims arising from CUTA's alleged informal application to build two new school buildings and to renovate an existing building; and (ii) plaintiffs' Section 1983 free exercise, free association, and due process claims, and RLUIPA substantial burden and exclusions and limits claims, to the extent those claims rely on the moratorium.

Plaintiffs' Section 1983 right to intimate association claim and all remaining state law claims are dismissed with prejudice.

Accordingly, the following claims remain: plaintiffs' (i) RLUIPA substantial burden and Section 1983 free exercise claims against the Village Defendants based on the NOV, and Section

1983 free exercise claim against the District; (ii) RLUIPA nondiscrimination and equal terms claims and Section 1983 equal protection claim against the Village Defendants based on both the NOV and the moratorium, as well as a Section 1983 equal protection claim against the District; (iii) RLUIPA exclusions and limits claim against the Village Defendants based on the NOV; (iv) Section 1983 claim for violation of their right to expressive association against the Village Defendants based on the NOV and against the District; (v) Section 1983 due process claim against the Village Defendants based on the NOV; and (vi) Section 1985(3) conspiracy claim against the Village Defendants and the District.

In addition, all claims against the individual defendants in their official capacities are dismissed. Further, all claims against the following defendants in their individual capacities also are dismissed: (i) John Cornelius, (ii) Douglas Whipple, (iii) Anthony Santucci, (iv) William Philip, (v) Russel Hock, (vi) Pavle Lecei, (vii) Ken Brezner, (viii) Suzanne Carley, (ix) Peter Blunnie, (x) Kevin Warbrick, (xi) Paul Marchesani, (xii) Anthony Valvo, (xiii) Village Attorney Sean Mack, (xiv) Deputy Village Attorney Daniel Kraushaar, and (xv) Village Clerk and Treasurer Lisa-Ann DiMarsico-Smith.

Thus, the only remaining individual defendants, sued in their individual capacities, are: (i) Philip Gigante, (ii) Charles Picarelli, (iii) Laurie DiFrancesco, (iv) Scott Meier, (v) Linda Carbone, (vi) Louis Zummo, and (vii) Marino Fontana.

All remaining defendants shall file answers by February 5, 2020.

Finally, as plaintiffs failed to file on ECF their October 17, 2019, proposed order to show cause, by January 29, 2020, plaintiffs shall file the October 17, 2019, proposed order to show cause on the docket as an exhibit to a letter. To be clear, plaintiffs shall use the ECF filing event "LETTER," and file their proposed order to show cause as an exhibit to the letter.

The Clerk is directed to:

1.      Terminate the motions (Docs. ##115 and 118);

2.      Terminate the following defendants from the docket:  (i) John Cornelius, (ii) Douglas Whipple, (iii) Anthony Santucci, (iv) William Philip, (v) Russel Hock, (vi) Pavle Lecei, (vii) Ken Brezner, (viii) Suzanne Carley, (ix) Peter Blunnie, (x) Kevin Warbrick, (xi) Paul Marchesani, (xii) Anthony Valvo, (xiii) Village Attorney Sean Mack, (xiv) Deputy Village Attorney Daniel Kraushaar, (xv) Village Clerk and Treasurer Lisa-Ann Dimarsico-Smith, (xvi) the Village of Airmont Board of Trustees, (xvii) the Village of Airmont Zoning Board of Appeals, (xviii) the Village of Airmont Planning Board, and (xix) the Building Department of the Village of Airmont.

3.      Make the following changes on the docket:  (i) change "Henny Werzberger" to "Lea Werzberger," and then change the notations after "Cheskel Werzberger" and "Lea Werzberger" from, "on behalf of their minor children, M.W., G.W., and C.W.," to "on behalf of their minor children, B.W., G.W., and C.W"; and (ii) change the notations after "Joel Gross" and "Rivky Gross" from "on behalf of their minor children, M.G. and W.G.," to "on behalf of their minor children, M.G. and W.L."

Dated:  January 22, 2020
        White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge